Charles E. EGGER, Plaintiff-Appellant,

v.

Harlan C. PHILLIPS,
Defendant-Appellee.

No. 80–2503.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 19, 1982.

Decided June 2, 1983.

Rehearing Denied June 22, 1983.

Certiorari Denied Oct. 17, 1983.
See 104 S.Ct. 284.

Belle T. Choate, Indianapolis, Ind., for plaintiff-appellant.

Elois E. Davies, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before CUMMINGS, Chief Judge, and PELL, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER and COFFEY, Circuit Judges.

ESCHBACH, Circuit Judge.*

In this case a former Special Agent of the Federal Bureau of Investigation claims that certain personnel decisions made by his former supervisor violated his rights under the First, Fifth, Sixth, and Ninth Amendments of the United States Constitution. The district court granted defendant's motion for summary judgment on all of plaintiff's claims. A panel of this court unanimously affirmed the district court's grant of summary judgment on plaintiff's Fifth, Sixth, and Ninth Amendment claims, but a majority of the panel reversed the grant of summary judgment on the First Amendment claim, observing that the question on that claim was a close one. See 669 F.2d 497, 504 (7th Cir.1982). On August 9, 1982, defendant-appellee's petition for rehearing with suggestion for rehearing en banc was granted. For the reasons which follow, we now affirm the judgment of the district court granting defendant's motion for summary judgment on all of plaintiff's claims.[1]

I

Shortly after he was dismissed from his employment as a Special Agent of the Federal Bureau of Investigation for failing to report to a new duty station in Chicago, Illinois, plaintiff-appellant Egger brought this action for money damages against his former supervisor at the FBI's Indianapolis (Indiana) Field Office, defendant-appellee Phillips, who had recommended Egger's transfer away from the Indianapolis office.

Egger's complaint, filed on August 18, 1978 in the United States District Court for the Southern District of Indiana, alleges that Phillips recommended the transfer and took other administrative actions adversely affecting Egger's employment with the FBI because of Egger's allegations of wrongful conduct directed against other personnel in the Indianapolis office. Styling Phillips' actions as retaliation against him for his efforts to expose alleged corruption in the Indianapolis office, Egger contends that Phillips violated his freedom of speech secured by the First Amendment.

Defendant filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on October 27, 1978, contending, *inter alia,* that the complaint failed to state a cause of action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and its progeny, the only possible source of a federal remedy in this case. On February 8, 1979, defendant filed his answer, generally denying the material allegations of the complaint and raising the defense of immunity. The district court denied defendant's motion to dismiss without discussion on July 9, 1979. On November 1, 1979, defendant filed a motion for summary judgment, together with supporting affidavits and other material, pursuant to Fed.R.Civ.P. 56, arguing that defendant's actions toward plaintiff were taken to preserve the effective functioning of the FBI's Indianapolis Field Office and also

---

* Parts III and V of this opinion are joined in by four judges: Chief Judge Cummings, and Judges Pell, Cudahy, and Eschbach. The remaining four judges of the court (Judges Bauer, Wood, Posner, and Coffey) consider it unnecessary to resolve the issues decided in parts III and V, and hence do not join in those parts of the opinion, as explained in the concurring opinion of Judge Posner. All judges, with the exception of Judge Cudahy, join in the other parts of the opinion. Judge Cudahy concurs in the result for the reasons set forth in his separate opinion.

Moreover, after this opinion was written and voted upon by this court, the United States Supreme Court's most recent case concerning the free speech rights of public employees was decided. See *Connick v. Myers,* —— U.S. ——,

103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Myers* provides additional support for our decision in this case regarding the free speech issue.

1. The panel affirmed, without discussion, the district court's grant of summary judgment in favor of defendant concerning plaintiff's Fifth, Sixth, and Ninth Amendment claims. 669 F.2d at 505. We agree that these claims do not merit discussion and accordingly summarily affirm the district court's judgment regarding these issues. Hence, in this opinion, we shall discuss only plaintiff's First Amendment claim.

Moreover, we hereby vacate the panel opinion. Ordinarily, the panel opinion is vacated when rehearing en banc is ordered, but it appears that such an order was not entered at that time in this case.

asserting that his actions were taken in good faith. Plaintiff responded to the summary judgment motion on December 7, 1979 with a "Statement of Genuine Facts" signed by counsel and in memorandum in opposition, arguing that the crucial issue in the case—defendant Phillips' state of mind—was not amenable to resolution via summary judgment. In addition, on January 31, 1980, plaintiff filed two affidavits, the first discussing certain personnel regulations of the FBI, and the second relating a portion of a telephone conversation between Egger and Phillips which Egger had recorded without Phillips' knowledge. Defendant filed a reply brief on January 31, 1980, together with additional affidavits and materials.[2]

After hearing oral argument on defendant's summary judgment motion, and receiving supplemental briefs and material, including a submission personally prepared by plaintiff,[3] the district court granted the motion for summary judgment on September 22, 1980. Based on a close examination of the large amount of documentary evidence before it,[4] the court's opinion consists largely of a detailed chronology of Egger's employment history with the FBI and his relationship with the personnel of the Indianapolis Field Office from the fall of 1977 through the spring of 1978. The court rejected plaintiff's First Amendment claim of retaliatory transfer, stating that plaintiff had failed to demonstrate a liberty or property interest in remaining assigned to the Indianapolis Field Office. Moreover, the district court concluded:

> Egger's activities substantially contributed to creating havoc in the Indianapolis Field Office of his employer. The Court takes judicial notice of the fact that the Federal Bureau of Investigation is a paramilitary organization wherein security of information, discipline and teamwork are of primary importance. Egger was disliked and not trusted by the majority of the personnel in the Indianapolis office.

\*     \*     \*     \*     \*     \*

> Even assuming that Phillips' efforts to have Egger transferred were in part motivated by Egger's attempts to uncover what he considered to be wrongdoing by other agents, the substantial legitimate basis for Egger's transfer supplants any element of causation between the assumed wrong motive and the transfer.

Dist.Ct.Op. at 48.

On appeal, the majority of the panel stated that the district court incorrectly charac-

---

2. During the course of the district court proceedings, disputes concerning discovery were referred to a magistrate. The details of these disputes are not important here. For our purposes, it is sufficient to note that while plaintiff's notice of defendant's deposition was initially vacated, the district court ultimately overruled the objection to the taking of the deposition on February 14, 1980 and stayed its ruling on the motion for summary judgment until March 31 for the express purpose of permitting plaintiff to reschedule a deposition of defendant. Plaintiff never rescheduled the deposition.

3. On June 5, 1980, the day before oral argument was scheduled on the motion for summary judgment, Egger moved for a continuance of the argument in order for him to secure new counsel. Egger was no longer satisfied with his retained counsel who had represented him throughout the course of proceedings below, citing a breakdown in communications with counsel and counsel's failure to vigorously pursue his case, implying that this failure was due to the attorney's fears, "whether real or imag-

ined," R. at 550, that his representation of plaintiff was linked to an "ambiguous" incident in March 1979 that the attorney viewed as a threat to his personal safety. R. at 323–25 (sealed April 13, 1979 affidavit of plaintiff's counsel, subsequently unsealed without objection by order entered October 2, 1979). The oral argument was held on June 6, 1980, as scheduled; counsel argued on behalf of plaintiff, and then withdrew from the case. Plaintiff, after listening to the arguments, prepared a five page argument raising points he thought important and not raised during the oral argument. This document, together with documents attached thereto, were filed without objection.

4. In addition to answers to interrogatories and affidavits, the parties proffered a great deal of documentary evidence, including Egger's personnel files, copies of letters and telex messages between Phillips and FBI headquarters, Egger's memoranda alleging wrongdoing, Egger's surreptitious tape recordings of conversations with Phillips, and miscellaneous other documents.

terized the controlling First Amendment doctrine regarding public employers' actions against their employees in retaliation for the exercise of free speech. The majority observed that appellant need not show a legitimate claim of entitlement to continued employment at the Indianapolis office in order to prevail on his claim that the transfer was carried out in retaliation for his exercise of First Amendment rights. 669 F.2d at 501–02. The majority, noting that summary judgment is often inappropriate when questions of intent are presented, concluded that the evidence before the district court created a genuine issue of material fact concerning the reason for appellee's recommendation to transfer Egger. *Id.* at 502–03. Moreover, the majority could not conclude on the record before the district court that "Egger's criticisms were so abrasive or disruptive of office routine as to be denied First Amendment protection as a matter of law," *id.* at 503, and the majority rejected appellee's defense of qualified immunity based on an analysis of the then controlling authority of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), noting that under *Economou,* the defense of good faith immunity raised the same issues of subjective intent as appellant's First Amendment claim. 669 F.2d at 504.

Panelist Senior District Judge Dumbauld, dissenting from the majority's reversal of summary judgment on the First Amendment issue, concluded that Egger's transfer was necessary for the effective functioning of the Indianapolis Field Office and that Egger's attempt to "clothe his peculiar behavior in the garb of the First Amendment" should be rejected. *Id.* at 505.

On rehearing en banc, appellee first resurrects an argument suggested below but not passed on by the district court and never presented to the panel on appeal: that the employment relationship between the FBI and its Special Agents counsels against judicial recognition of a damage remedy arising directly under the Constitution. *See generally, Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 403 U.S. at 396, 91

S.Ct. at 2004. Appellee also argues that even if a *Bivens* claim is entertained, summary judgment was appropriate, contending that the undisputed facts demonstrate that his recommendation to transfer Egger was not retaliatory, and also arguing that under the recent case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), decided after the panel's decision in this case, he should prevail on the ground of qualified immunity.

II

A party seeking summary judgment under Fed.R.Civ.P. 56 must demonstrate the absence of a genuine issue of material fact. *E.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142 (1970). In judging whether or not the movant has met this burden, the court must view the evidence submitted by the movant in the light most favorable to the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). If, and only if, the movant meets his initial burden, it is incumbent upon the opposing party "to set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate [as a matter of the governing law], shall be entered against him." Fed.R.Civ.P. 56(e). *See Thornton v. Evans,* 692 F.2d 1064, 1074–1076 & n. 29 (7th Cir.1982). *See generally, Markwell v. General Tire and Rubber Co.,* 367 F.2d 748, 750 (7th Cir.1966); *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir.1970). However, it is always prudent to respond to a motion for summary judgment, even if the opposing party believes that the movant has failed to sustain his initial burden.

Moreover, a factual dispute does not preclude summary judgment unless, of course, the disputed fact is outcome determinative under the governing law. It is thus axiomatic that even in the face of some factual disputes, "where the *undisputed facts* demonstrate that one party is entitled to judgment as a matter of law, summary judg-

ment in favor of that party is entirely appropriate," *Collins v. American Optometric Association,* 693 F.2d 636 at 639 (7th Cir. 1982), just as it is plain that if genuine factual disputes are resolved in favor of the non-movant, summary judgment may be entered in favor of the movant if appropriate as a matter of law, *Bishop v. Wood,* 426 U.S. 341, 348 & n. 11, 96 S.Ct. 2074, 2079 & n. 11, 48 L.Ed.2d 684 (1976). *See generally* 6 (pt. 2) Moore's Federal Practice, ¶ 56.15[4] (2d ed. 1982) ("the party moving for summary judgment has the burden of clearly establishing the non-existence of a genuine issue of fact that is material to a judgment in his favor.") (footnote omitted).

### III

■ At the outset, we reject appellee's suggestion that FBI agents should be precluded from bringing private damage actions against their superiors for alleged violation of their constitutional rights arising in the scope of their employment. Appellee points out that there may be special factors counseling hesitation in recognizing a cause of action arising directly under the Constitution, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 403 U.S. at 396, 91 S.Ct. at 2004, and argues that Congress's unwillingness to provide FBI agents with civil service protections is such a factor, as is the particular employment relationship itself.

In *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Court stated:

> *Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when the defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under

the Constitution and viewed as equally effective.

*Id.* at 18–19, 100 S.Ct. at 1471 (citations omitted).

Under the particular analysis employed by the Court in *Carlson,* neither situation can be said to exist in the instant case: it can hardly be maintained that FBI agents "enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate," nor is there any "explicit congressional declaration that persons injured by federal officers' violations of the [asserted constitutional provision] may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress." *Id.* at 20, 100 S.Ct. at 1472.

If *Carlson* is viewed as a comprehensive statement of the situations in which a court should refuse to entertain a *Bivens* action, then our analysis would end there. *Compare Sonntag v. Dooley,* 650 F.2d 904 (7th Cir.1981). However, in view of the general language of *Carlson,* and the fact that the Supreme Court has recently indicated that contentions similar to arguments raised by appellee here are not "insubstantial," *Harlow v. Fitzgerald,* 457 U.S. 800, 820 n. 36, 102 S.Ct. 2727, 2740 n. 36, 73 L.Ed.2d 396 (1982), we shall explore appellee's arguments in some depth.

Appellee first points to FBI agents' exemption from civil service protections, *e.g.,* 28 U.S.C. § 536, as a special factor counseling hesitation in entertaining a *Bivens* action arising from employment. On the contrary, the absence of an alternative remedy is considered a factor in favor of recognizing *Bivens* claims. *Davis v. Passman,* 442 U.S. 228, 243–44, 99 S.Ct. 2264, 2276, 60 L.Ed.2d 846 (1979). Indeed, Justices who were unwilling to embrace the sweeping language of *Carlson* view the narrow holding of *Bivens* and its progeny as being limited to situations in which a civil rights plaintiff has no other effective remedy. *Carlson v. Green,* 446 U.S. 14, 25, 26, 100 S.Ct. 1468, 1475, 64 L.Ed.2d 15 (concurring opinion of Powell & Stewart, JJ.), 30, 31,

100 S.Ct. at 1477, 1478 (Burger, C.J., dissenting). Justice Harlan made this point as follows: "For people in Bivens' shoes, it is damages or nothing." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 403 U.S. at 410, 91 S.Ct. at 2011 (Harlan, J., concurring) (quoted with approval in *Butz v. Economou, supra,* 438 U.S. at 504–05, 98 S.Ct. at 2909–2910). The same may be said of one in Egger's position, and we reject appellees' attempt to transmute a primary factor counseling recognition of a *Bivens* action into a factor counseling hesitation.

Appellee's argument in this regard might also be viewed as suggesting that the exemption of FBI agents from civil service protections represents a decision by the Congress to preclude a *Bivens* action by such individuals. The exemption, however, is a far cry from the " '*explicit* congressional declaration' " that would be necessary to preclude a group from their only avenue for vindicating particular deprivations of their constitutional rights. *Davis v. Passman,* 442 U.S. 228, 246–47, 99 S.Ct. 2264, 2277–2278, 60 L.Ed.2d 846 (1979) (quoting *Bivens, supra,* 403 U.S. at 397, 91 S.Ct. at 2005) (emphasis in *Davis* ).

Appellee's reliance on *Bush v. Lucas,* 598 F.2d 958 (5th Cir.1979), *vacated and remanded,* 446 U.S. 914, 100 S.Ct. 1846, 64 L.Ed.2d 268 (1980), *on remand,* 647 F.2d 573, *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982), demonstrates the speciousness of appellee's argument that Egger's exemption from civil service protections precludes this *Bivens* action. In that case, the court viewed the *existence* of civil service protections as a special factor precluding recognition of a *Bivens* action. Appellee thus argues that *Bivens* claims by federal employees should be disposed of on a "heads I win, tails you lose" mode of analysis: if Congress provides certain protections for federal employees, we should view them as exclusive, and if it does not provide those protections, we should infer that no protection is permitted. Suffice it to say that Catch-22 has no place in our constitutional jurisprudence.

Moreover, to the extent that *Bush* posits that the rights of federal employees *qua* employees are coterminus with the administrative protections afforded by Congress, we reject it. *See Borrell v. United States International Communications Agency,* 682 F.2d 981 (D.C.Cir.1982).[5] While it may be that to the extent Congress has declared certain employment practices unlawful which are also unconstitutional and provide federal employees with adequate remedies for such violations, a *Bivens* action should not be entertained, *see Gissen v. Tackman,* 537 F.2d 784 (3d Cir.1976) (per curiam) (en banc); *cf. Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *see generally, Purtill v. Harris,* 658 F.2d 134 (3d Cir.1981), the constitutional rights of federal employees in the workplace which are not protected by statute properly form the basis of a *Bivens* action. The contrary conclusion would relegate federal civil servants to a second class status in relation to their state counterparts, and create a double standard between federal and state actors which the Supreme Court has condemned. *See Butz v. Economou, supra,* 438 U.S. at 500–02, 98 S.Ct. at 2907–2908.

**5.** *Bush* is of questionable viability, at best. The Supreme Court vacated the Fifth Circuit's first opinion in *Bush* and remanded the case for further consideration in light of *Carlson v. Green, supra,* which analyzed discretely the questions of special factors counseling hesitation and alternative remedies, and required an explicit declaration by Congress to preempt the *Bivens* remedy on the latter basis. On remand, the Fifth Circuit adhered to its position that the existence of civil service remedies was itself a special factor counseling hesitation, and thus maintained that an explicit declaration was unnecessary. The Supreme Court granted certiorari once again. *Borrell,* on the other hand, is particularly salient in this case. A probationary employee alleged she was discharged in retaliation for exposing violations of law within the office. If true, that would violate 5 U.S.C. § 2302(b)(8)(A), which specifically prohibits such reprisals. As a probationary employee, however, plaintiff's only remedy was that provided under 5 U.S.C. § 1206, a limited administrative one. The court found no implied right of action under § 2302(b)(8)(A), but nevertheless entertained the cause of action under a First Amendment theory.

In this case, however, appellee does not contend that all federal civil servants should be precluded from bringing *Bivens* actions against their superiors for on-the-job violations of their civil rights. However, FBI agents, we are told, should not be permitted to bring such claims, at least with respect to inter-office transfer decisions. Pointing to *Bullard v. Webster,* 623 F.2d 1042 (5th Cir.1980), which holds that a transfer of an FBI agent is not judicially reviewable for the purpose of assuring that the transfer decision was factually substantiated, appellee notes the importance of providing the Bureau with flexibility in ascertaining its own manpower needs. It is one thing to hold that the courts do not have a roving authority to second-guess the wisdom of often subjective personnel decisions; it is quite another to hold that such decisions should be free from judicial scrutiny in the face of a claim that the decision-maker acted in retaliation for the employee's exercise of his constitutional rights. *Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976) ("The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. *In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights,* we must presume that official action was regular and, if erroneous, can be best corrected in other ways.") (emphasis added). In personnel decisions, as in other official matters, official discretion should be limited by constitutional constraints, and such constraints cannot be considered to be an undue burden on our administrators. To the extent that defending against *Bivens* suits is a burden on such officials, all that can be said is that the burden can be minimized through appropriate application of the federal rules to week out unmeritorious claims. The burden that remains is one of the prices an individual must pay when he becomes a public servant with constitutionally imposed restraints on his actions.[6] It is a price which Phillips now must pay.

In this context, it is paradoxical that appellee contends that FBI officials—charged with the official responsibility of vigorously enforcing the constitutional rights of all citizens—should themselves be free from the burden of defending such suits brought by their own subordinates because of the special nature of their responsibilities. Other supervisory employees in the federal service live with this burden, as do the state counterparts to FBI agents, state and local police—so can FBI officials. Other federal agencies manage their personnel and carry out their mandates subject to the possibility of such suits, as do state and local police departments.[7]

**6.** The distinction between public and private employers in this respect is becoming blurred. *See, e.g., Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981) (recognizing a tort of retaliatory discharge: based on public policy grounds, private employer liable for discharging at-will employees for reporting unlawful conduct of co-workers to law enforcement authorities).

**7.** We note that the fact that this is a First Amendment case is not a factor in the *Bivens* calculus. While the Supreme Court has thus far expressly approved *Bivens* actions based on violations of the Fourth Amendment's search and seizure clause, *Bivens, supra,* the Fifth Amendment's due process clause, *Davis v. Passman, supra,* and the Eighth Amendment, *Carlson v. Green, supra, Carlson* indicates that the factors considered in determining whether such a cause of action may be entertained are independent of the particular substantive constitutional basis of the claim. While a footnote in *Harlow* tends to indicate that the particular constitutional provision may be a factor in the analysis, *Harlow v. Fitzgerald, supra,* 457 U.S. at 820 n. 36, 102 S.Ct. at 2740 n. 36, we believe the *Bivens* question is a discrete one from the question of the merits of the constitutional claim. Thus, if the plaintiff in *Davis,* for example, who was employed by a Congressman, brought a First Amendment freedom of speech claim, the same factors would determine whether a *Bivens* remedy would lie. It may very well be that such an employee, given the nature of the employment, *see generally Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S.

Finally, appellee argues that the particular contractual relationship between the FBI and its agents is a special factor counseling hesitation in recognizing a *Bivens* action. FBI agents expressly agreed to be transferred anywhere the needs of the service demand. The short answer to that argument is that the agents do not expressly agree to be transferred anywhere in violation of their constitutional rights. In any event, in essence, under the guise of an analysis of special factors counseling hesitation, appellee would have this court reach the merits of this case and hold that the FBI may condition employment upon the relinquishment of constitutional rights. We shall address that argument in our discussion of the merits of this case.

We now proceed to the facts of this case. We recite the facts of the voluminous record in great detail both because of the posture in which this case reaches us, *see Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight,* 700 F.2d 341, 343 (7th Cir.1983); and because the nature of Egger's claim requires a particularly individualized and searching review of the record, *see, e.g., Monsanto v. Quinn,* 674 F.2d 990, 996 n. 10 (3d Cir.1982), *Tygrett v. Barry,* 627 F.2d 1279, 1282–83 (D.C.Cir. 1980); *see also, Grausam v. Murphey,* 448 F.2d 197, 201 (3d Cir.1971), *cert. dismissed,* 405 U.S. 981, 92 S.Ct. 1207, 31 L.Ed.2d 257 (1972).

### IV

In January 1971 the FBI offered Egger a position as a Special Agent. Egger accepted the offer of employment, executing an agreement which specifically provided:

I may be sent to any part of the continental or territorial United States that the exigencies of the Bureau's work may require; that my headquarters may be fixed in some jurisdiction other than in which I have heretofore resided; that my headquarters may be changed as the work of the Bureau may require and that no transfer will be made from one station to another for personal reasons.

R. at 388.

After short stints at FBI offices in Arkansas and Wisconsin, Egger requested a hardship transfer to the Indianapolis Field Office, citing the advanced age and illness of his mother and his wife's parents all of whom lived about 55 miles from Indianapolis. The request was initially denied, only to be reconsidered and granted a week later in early 1973.[8] His hardship status was thereafter annually reviewed.

Egger performed his duties as a Special Agent in Indianapolis for several years without controversy. His performance ratings were routinely either satisfactory or excellent on a four-part scale which ranged from unsatisfactory to outstanding. In 1974 he was the object of an anonymous death threat, apparently in connection with one of his pending investigations. In 1976 he was reprimanded by the Director of the FBI for a delay in reporting an alleged civil rights violation, though earlier in his career he was individually commended by the Director for his work on another investigation. In short, Egger's employment history might be considered rather ordinary.

In the fall of 1977, however, the seed of the instant controversy was planted. Egger was then assigned to the organized crime squad and was investigating gambling activity in the area. Apparently as a part of this investigation Egger read a file

---

347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); could be discharged on the basis of speech that would be protected in other employment situations (*e.g.,* if she advocated the election of her boss's opponent), but the case would not be dismissed for want of a metaphysical pass through the courthouse doors.

**8.** There is no explanation in the record explaining this sudden and ostensibly unsolicited turnabout. In this regard, the district court thought it noteworthy that Egger later maintained he did not bring outside pressure to bear regarding the transfer, the court implying that this representation was less than accurate. We can understand the basis of the court's suspicions in this regard, *see* R. at 124, but deem the question irrelevant in any event. We do think, however, that the circumstances surrounding Egger's initial hardship transfer to Indianapolis illustrates the essentially subjective nature of such transfer decisions.

memorandum dated January 23, 1976 written by one of his colleagues in the Indianapolis Field Office, Special Agent Naum. The memorandum was based on an interview with one of Naum's informants and contained allegations that an Indianapolis police officer, one Lt. Moistner, had accepted a bribe. Egger knew that in May 1977 Naum had been called as a character witness on behalf of Moistner's defense in a criminal trial, testifying that Moistner's reputation among FBI agents in the Indianapolis Field Office was that of an outstanding police officer. Armed with this information and the January 23, 1976 memorandum, Egger began forming the belief that Naum acted improperly in testifying on behalf of Moistner, and in November 1977 shared his suspicions with another Special Agent in the Indianapolis Field Office, Special Agent Mullen, who indicated to Egger that he would discuss the matter with Special Agent in Charge Lowie.

In mid-December, Naum confronted Egger and accused him of leaking information to the local press and local prosecutor's office. Egger denied leaking information. Naum also criticized Egger for interviewing a particular individual regarding a pending investigation, and accused Egger of interviewing that person for the sole purpose of incriminating Naum and Moistner. "[A]nyone who would do that," Egger quoted Naum as saying, "would be met in the alley with a baseball bat and hit in the kneecaps." R. at 130. Egger did not take this as a serious threat and said he ignored it, for a time that is. Also sometime in December, Egger's wife received an anonymous phone call, threatening her and her children unless Egger ceased his current investigations. Egger reported this incident to his squad supervisor, but Egger did not think it was significant enough to warrant preparing a memorandum and later

specifically stated he did not want his wife interviewed concerning the incident.

Egger received a phone call from an investigator in the Marion County Indiana prosecutor's office on December 19, 1977, who expressed his office's belief that Naum had violated federal law by testifying on behalf of Moistner, and told Egger that his office intended to write the Department of Justice in Washington and request creation of a special strike force to investigate local officials, particularly police officers, for RICO violations.[9] The prosecutor wanted an outside investigation, according to Egger, because his office did not trust Special Agent Naum. Egger reported the foregoing conversation to Lowie, who asked Egger to tell the prosecutor that Egger would be assigned to investigate the matters and that intervention from Washington was unnecessary. When Egger relayed the message, the prosecutor agreed to withhold the letter to Washington if Lowie would personally assure him that Egger would conduct the RICO investigation. The prosecutor also advised Egger that the United States Attorney in Indianapolis wanted to speak with him. They met on December 21, 1977, and, according to Egger, the United States Attorney was favorably disposed toward conducting a RICO investigation.

The next day, Naum confronted Egger and accused him of circulating rumors about him in an attempt to get him fired, and charged Egger with disseminating copies of confidential informant files outside the FBI. Naum, whom Egger described as "very agitated," R. at 308, then told Egger that Lowie wanted to meet with him.

In the meeting with Lowie, Lowie informed Egger that he had just conferred with the United States Attorney who reportedly said that she did not want to conduct a RICO investigation at that time because she thought that the Marion County

---

**9.** There is some discrepancy in Egger's statements regarding with whom the idea for such an investigation originated. In his December 27, 1977 memorandum to Lowie regarding the conversation, Egger states that the idea was forwarded by the prosecutor's office, while in his February 7, 1978 affidavit prepared for the

Office of Professional Responsibility Egger indicates that he informed the county investigator of a possible RICO violation. *Compare* R. at 307 & 130. RICO is an acronym for the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68.

prosecutor's office was perhaps conducting a vendetta against Naum. Further, Lowie expressed his concern about "possible bad blood" between Egger and Naum, advising Egger that he "felt it would be best if he transferred [Egger] to [another] squad in order to preserve office harmony." R. at 308. Egger stated that if he was being accused of wrongdoing he would like to know the charges so that he could take a polygraph examination. Lowie responded that was unnecessary and that Egger would remain on his current squad.

During the first week of January 1978, Egger learned from the Marion County prosecutor's office that a letter had been sent to the FBI and the Department of Justice in Washington regarding the office's aforementioned concerns since Lowie had never personally contacted that office. Egger did not advise Lowie, nor any other supervisory FBI official, of this fact.

In mid-January 1978, news media accounts concerning Naum's testimony on behalf of Moistner began appearing. The stories appeared to be based on the same information which Egger had discovered in Naum's January 23, 1976 file memorandum and reported that Naum had failed to obtain FBI permission prior to testifying. Lowie asked Egger if he was leaking this information to the press, an accusation which Egger denied, again volunteering to take a polygraph examination.

In early February 1978, officials of the Department of Justice and the FBI's Office of Professional Responsibility (OPR) visited the Indianapolis Field Office and interviewed employees there regarding the now public controversy surrounding Naum.[10] In addition, OPR was also making inquiries into suspected leaks of confidential FBI files, among other matters, and questioned Egger about this. Egger believed that he was the first person interviewed by OPR, and was surprised that the interview commenced with a recitation of his legal rights. Initially under the "impression" that the

OPR visit was primarily intended to provide him with a forum for substantiating his charges against Naum and sharing now maturing suspicions about others in the office, Egger was taken aback to find himself in the role of the accused. R. at 170. "Intimidated" by this turn of events, R. at 104, Egger was circumspect in answering the list of prepared questions posed by the OPR investigators, but did execute a sixteen page affidavit for them concerning his suspicions about Naum and the need for a RICO investigation.

Special Agent in Charge Lowie was transferred out of the Indianapolis Field Office shortly after the OPR investigators departed and defendant-appellee Phillips was transferred to the office and assumed the post of Special Agent in Charge on February 13, 1978.

Phillips was greeted on the day of his arrival with a written complaint accusing Egger of unauthorized use of an FBI automobile the previous week and attending a basketball game while on duty. The complaint was apparently made by one of Egger's co-workers. Over the next few days, Phillips informed Egger of the accusation but would not identify the accuser. Egger orally denied the charges. After consulting an attorney, Egger declined to give a sworn statement regarding the alleged incident, but rather, discussed the matter in an unsigned statement and took this opportunity to inform Phillips that within the last week it had come to his attention that Naum had been telling fellow agents and the Indiana State Police that Egger was leaking information to the press and accepting bribes from organized crime. Egger also informed Phillips that Naum had been threatening him (apparently the previously ignored comment about being hit with a baseball bat) and that he had learned from a clerical employee in the office that Special Agent McElhaney cautioned her not to be friendly with Egger and indicated that something could happen to Egger and other agents if

---

10. The record does not reveal what prompted the OPR investigation, though it seems plausible that it was initiated in response to the letter

from the Marion County prosecutor's office, the adverse publicity concerning Naum, or both.

they remained in Indianapolis.[11]  Egger stated that "It is common knowledge that agents have been instructed to have nothing to do with me," and concluded, "I view the whole incident as an attempt to harrass, intimidate and embarrass me." R. at 191.

Phillips apparently concluded that Egger had improperly used the FBI vehicle and attended the basketball game but this incident was not made the recommended basis of any disciplinary action by Phillips at that time. Rather, Phillips forwarded the information, including Egger's handwritten statement, to OPR.

A few days after Phillips and Egger had discussed the incident involving the car and basketball game, Egger handed Phillips a memorandum dated February 21, 1978, in which he amplified the charges about Naum and McElhaney which he had earlier made in the handwritten statement.[12]  In it he accused Naum of spreading "outright lies" about him, and concluded by saying: "I respectfully request that this situation is of such gravity that these 'rumors' should be dealt with and the employees of this office should be so informed." R. at 545 (February 21, 1978 Memorandum from Egger to Phillips contained in unpaged additional submission filed by plaintiff March 31, 1980). When Egger gave the memorandum to Phillips, Phillips commented that the Bureau took a dim view of complaints and sometimes transferred all involved.[13]  Phil-

lips made some inquiries regarding Egger's allegations, and several days later forwarded Egger's memorandum and the results of his investigation to FBI headquarters.

On March 1, 1978, Egger sent Phillips a memorandum suggesting that Indianapolis police officers suspected Naum of accepting bribes from local criminals involved in gambling. Phillips and Assistant Special Agent in Charge Wells investigated this latest accusation but obtained no information to verify the charge. Two days later, Phillips once again forwarded Egger's memorandum to FBI headquarters. This time, however, he attached a recommended course of action to deal with the series of charges and countercharges between Egger and Naum with which he had been confronted in the three weeks since he had assumed command of the Indianapolis Field Office. In his March 3, 1978 memorandum to FBI headquarters, Phillips stated:

> [B]ased on my observations since my arrival in Indianapolis ..., it is obvious that both SA [acronym for Special Agent] NAUM and SA EGGER have lost their effectiveness as Agents in this field division. I am personally aware that many of the Agents on EGGER's squad refuse to work with him because they feel he is untrustworthy, unpredictable and may possibly be disclosing sensitive information from our files to outside sources.... EGGER's credibility and reliability are seri-

---

11.  Egger apparently recalls that he told Phillips in February in conclusory terms that Naum had made threats. In a March 16, 1978 telephone conversation between Egger and Phillips, which Egger secretly tape recorded, Egger told Phillips about the baseball bat remark Naum had made. From the context of that conversation, it appears that this was the first time Egger informed Phillips of the particular remark made by Naum.

12.  The clerical employee executed a conclusory affidavit in which she stated that McElhaney never "threat[ened]" Egger nor anyone else in her presence. R. at 502. McElhaney, in a declaration under penalty of perjury, *see infra* at n. 19, denied telling the clerical employee to disassociate herself from Egger, denied saying something would happen to Egger, and stated that he merely said that he would be "surprised" if anyone spoke to Egger, Naum, or

another agent (Hay) while the OPR investigation was pending to avoid becoming involved with "gossip." R. at 500.

It is unclear what connection Special Agent Hay had with the charges and countercharges between Egger and Naum. In his February 21, 1978 memorandum, Egger claimed that the clerical employee was told not to talk with either Egger or Hay. Later, Egger added another agent (Rissen) to the list of individuals to whom McElhaney directed the clerk to give the "silent treatment," R. at 111, but again his connection with the underlying controversy is unclear.

13.  One of Egger's reports attributes this statement to Phillips, R. at 111, and we assume for purposes of this opinion that such a statement was made, as did the district court, R. at 594–95 (Dist.Ct.Op. at 12–13).

ously questioned among the personnel of this office.

\*   \*   \*   \*   \*   \*

There is no question in my mind that the continued presence of SAS Naum and Egger in this office will only serve as a catalyst, cause further dissention, bickering, allegations and general confusion.

\*   \*   \*   \*   \*   \*

I recommend that both SAS Naum and Egger be transferred from Indianapolis. I believe this action to be in the best interests of each of them as well as the Indianapolis Office and the Bureau as a whole. I recommend that this action be handled expeditiously.

R. at 596–97 (Dist.Ct.Op. at 14–15) (quoting In Camera Exh. A, Pt. I, Mar. 3, 1978 memo at 3.)

In the following days in early March 1978, Egger continued his gambling investigation and obtained additional information which he viewed as damaging to Naum. While writing a report on these latest findings at the Indianapolis office in the early evening of March 8, Egger received a phone call from his daughter at home. She was hysterical, and told Egger that a gunshot had been fired through a window of the house. Egger turned to another agent present in the office and said that someone had just shot at his home. As Naum's threatening words echoed in Egger's memory,[14] the other agent suggested that he inform the Special Agent in Charge of the apparent shooting. Egger responded: "Fuck the Bureau, they're at the bottom of this anyway," and stated that he was going to make someone very sorry for the incident.

After Egger arrived home that evening, he spoke with Special Agent Rissen (one of his colleagues on the organized crime squad) on the phone and told him that he had reported the incident to local police. Moreover, he insisted that the FBI stay out of the matter because of his distrust of certain agents in the Indianapolis office.

Early the next morning, Egger called the night clerk at the Indianapolis office and asked to be placed on annual leave. Word of the shooting incident was all over the office, but Egger had not yet reported it to Phillips. Rissen had visited Egger's house, and provided Phillips with some information about the incident, and told Phillips about Egger's desire to have local police handle the matter rather than the FBI. Egger's squad supervisor called Egger that morning as well and obtained additional details.

Phillips was irritated with Egger for failing to inform him personally about the incident, an irritation which was exacerbated when Phillips received a phone call from a reporter concerning the episode when Phillips had only second-hand information about it. Phillips called OPR in Washington and reported what he considered to be Egger's dereliction of duty. Later, he called Egger at home. Phillips began the conversation by saying that he had just received a call from a reporter about the alleged shooting and remarked that it was embarrassing to learn of such an incident from the press. Egger reacted defensively to Phillips' critical salutation, and interpreted it as an accusation that he had contacted the media about the incident. Moreover, since Egger had talked to his squad supervisor about the shooting, Egger felt Phillips' criticism was unjustified in any event. The two argued; Egger indicated a desire to resign; and finally the conversation ended abruptly when Egger hung up on Phillips. Phillips immediately phoned Egger's home again, but Egger had instructed his son to answer and say that he was unavailable. Phillips again called OPR in Washington, advising them that he was going to Egger's home and that Egger might resign, but Phillips apparently changed his mind about going to see Egger that day.

14. In one of Egger's many introspective reports, he disclosed that upon receiving the call, a threat from an employee in the office, presumably Naum, though perhaps McElhaney, came to mind. R. at 113.

The next morning, two days after the shooting incident, Egger again called the night clerk at the Indianapolis office and asked to be placed on annual leave for the second time. Phillips learned of this and considered Egger's action improper since Egger had not obtained authorization for annual leave from his squad supervisor. Phillips obtained authorization from headquarters to place Egger on administrative leave or suspension based on his response to the shooting incident. Phillips called Egger and instructed him to come into the office to discuss the matter; Egger agreed to come, noting that he would be accompanied by his attorney.

Egger arrived for the meeting with Phillips and Wells (the Assistant Special Agent in Charge, as previously noted) without a lawyer. The meeting was acrimonious: Phillips asked if Egger still intended to resign; Egger reacted by stating he would not submit to interrogation and that he had not yet decided, having yet to consult his attorney; Phillips criticized Egger for his handling of the shooting incident; Egger made accusations about co-workers, saying half the office thought it was humorous that a shot had been fired at his home. Phillips advised Egger that administrative action against him might be instituted if he refused to cooperate; Egger expressed displeasure that OPR had done nothing, that he was tired of the abuse he had been receiving, that he did not want the Indianapolis office to contact his family about the shooting, and that perhaps the entire situation might be better resolved in a federal court. Egger refused to discuss his response to the shooting incident.

Phillips suspended Egger on the spot, but later changed the designation to administrative leave. He accompanied Egger home to confiscate Egger's FBI property. Egger was unable to locate certain property which was charged out to him, but did turn over his government issued revolver and a walkie-talkie that had been unaccounted for since the previous year, in spite of repeated office announcements requesting its return of which Egger says he was unaware. While at Egger's home, Phillips examined the broken window. There was a hole with radiating fracture lines in an outer storm window, but the inner window was not broken. Phillips expressed his belief that the damage had been caused by a rock or BB gun.

The next day, March 11, Phillips contacted several former colleagues of Egger, including one of Egger's former supervisors during less turbulent times for Egger, and inquired about Egger's emotional stability. The former supervisor, who had given Egger favorable performance ratings, was less enthusiastic about Egger in hindsight, calling him strange, not dependable and immature. Phillips suggested a psychiatric examination of Egger might be warranted, and another former supervisor agreed, indicating his belief that Egger had become paranoid regarding other agents. Phillips then sent a priority teletype message to FBI headquarters describing the situation and requesting authorization for an immediate fitness for duty evaluation, including a psychiatric examination. Headquarters granted his request.

Egger was permitted to submit a list of three psychiatrists from which one would be selected to conduct the examination. On March 15 and 16, Egger, who was still on "administrative leave," telephoned Phillips to give him the list and schedule an appointment. The conversations (tape recordings of which are part of the record, courtesy of Egger, who recorded them without Phillips' knowledge) were subdued, but not hostile. Egger was conciliatory, at times apologetic, lamenting that "unfortunately, I've gotten off, to, you know, a horrendous start with you ...," and assuring Phillips that "I know you were thrust into a position that ah, is not of your making...." In the first conversation, Egger said that he was going to send a letter to the Director, directly if Phillips would prefer not to become involved. Egger recapitulated his concerns about Naum testifying for Moistner, without mentioning Naum by name, his concerns about the OPR investigation, his concerns about being unjustly accused of leaking information, and made vague refer-

ences to numerous threats against him while emphatically insisting that he was "not trying to imply, by any stretch of the imagination, that an FBI agent shot through my window." Phillips listened patiently to Egger's somewhat rambling story,[15] but repeatedly asked whether Egger had any new information that had not been provided to OPR. Egger did level one new charge against Naum, without mentioning him by name. In addition, Egger confided: "My greatest fear is that I'm gonna get backed into a corner where I don't have any choice but to go outside of the Bureau . . . ." Phillips summarized his position by telling Egger:

> I've got a responsibility to the office . . . . If you've got a complaint and . . . you think there's a problem in the office and it hasn't been satisfactorily addressed, you know, I couldn't do anything but encourage you . . . let's bring it to the attention of the Bureau. If it needs to be addressed, we need to do it . . . . I wouldn't for a minute try to discourage you from submitting it.

During the second conversation, Egger was more specific in his charges, specifically referring back to his February 21 memorandum to Phillips in which he discussed the alleged threat by McElhaney, and in response to a request by Phillips to provide him with the particulars of other threats, he told Phillips about Naum's December statement about being met in a dark alley, noting that the statement was previously reported to OPR. Nevertheless, Egger stated that he could not believe that McElhaney nor anyone in the office could have had anything to do with the shooting incident. Moreover, Egger stated that "passions were inflamed . . . to the boiling point . . ." in the office in recent months. Phillips repeatedly encouraged Egger to express his concerns in the report to the Director which Egger said he was going to prepare, but emphasized the importance of not dealing in rumor and gossip. Egger expressed uncertainty about including in the report a

discussion of the shooting incident and threats he had received, and Phillips responded:

> I would suggest . . . if you feel something's pertinent, . . . you better not hold back, better lay it all out . . . make sure its not gossip or half-truth, something that could be documented, or at least pursued . . . don't withhold anything, cause I don't wanna later on be in a position of, you know, saying that Mr. Phillips or Mr. Wells, or anybody, had indication that you had a suspect or somebody was threatening you . . . I'd get it right out there and we'll shoo it in . . . .

On March 15, Naum announced to the office that he was being transferred to Buffalo, New York, a transfer which Egger maintains that everyone in the office knew Naum had long wanted. The same day Egger telephoned the Justice Department OPR in Washington. Inquiring about the status of the OPR investigation, he was told that it was an FBI matter and that there was a report at FBI headquarters.

When on leave, Egger listened to FBI radio transmissions on a radio scanner and heard a communication by Naum which indicated to Egger that Naum had been examining Egger's informant files. Also apparently when on leave, Egger talked again to Robertson, the Marion County Prosecutor's office investigator, who told Egger that a newspaper reporter had told Robertson that Naum was leaking information to the press. Robertson also told Egger that an Indiana State Police detective had told Robertson that Naum had vouched for the reliability of one of the detective's informants in the Moistner case. Robertson told Egger that he had previously provided all of this information to OPR investigators, and noted that the detective had never been interviewed by the OPR team.

On March 18, Egger was examined by one of the psychiatrists he had suggested. By that time, Egger was no longer on ad-

---

**15.** In this regard, it should be noted that Egger was ill with some sort of a virus at the time of this conversation.

ministrative leave, but was on sick leave. Before receiving a final report from the psychiatrist, Phillips allowed Egger to return to duty on March 22, upon being advised that Egger had recovered from his illness.

On the day Egger returned to duty, he learned of an investigative report Naum had filed on March 10. Egger believed that Naum was derelict for not filing this report sooner or sharing the information with Egger months before, thinking that the information would have aided his gambling investigation [16] and believing that Naum's delay actually endangered Egger's life.

When Egger returned to work, he was told that his gambling investigation had been reassigned to another agent. Over the next several days, Egger submitted several memoranda to Phillips: accusing Naum of press leaks based on Robertson's statements; stating a certain gambler might be involved in the shooting incident; and reiterating certain other allegations about Naum. Also during this time period, Egger met with his squad supervisor, expressing displeasure at being taken off the gambling investigation and stating he had a report which he was sending directly to the Director (fearing it would not reach him if sent through channels). Egger also made statements to both Phillips and his squad supervisor implying that his fear of being forced to go outside the Bureau might become a reality.

On March 23, Phillips met with Robertson, sharing with Robertson his belief that there was merely a running dispute between Egger and Naum and that his solution might be to transfer both agents. The same day, Phillips telephoned FBI headquarters and inquired about the status of pending administrative action against Egger and was told it was being held in abeyance pending receipt of the psychiatric report, which was expected the next day. Phillips told headquarters that he was at "wits end and very disturbed by the latest

action by SA Egger, who [that] afternoon ... furnished him with various memoranda." R. at 545 (unpaged submission). Phillips told headquarters the contents of those memoranda, and said that Egger had implied that he might release a report he had prepared to the press, but refused to furnish it to OPR, headquarters, or the Department of Justice. Lastly, Phillips said that he had asked Egger to respond to an "administrative write-up" citing Egger for failing to report the shooting, failing to charge out the walkie-talkie, and other matters. Phillips was told to advise headquarters of the outcome of the psychiatric report and Egger's response to the alleged administrative improprieties.

Phillips met with the psychiatrist the next day, and was advised that Egger was mentally fit for duty. Phillips reported this to headquarters in a priority teletype, in which he also reported: (1) Egger continued to make allegations similar to previous ones; (2) Egger said he had decided against sending a letter to the Director containing additional allegations; (3) Egger was preparing a response to the administrative write-up; (4) Egger insisted that Phillips interview numerous individuals regarding his charges against Naum; and (5) the results of the ballistics test (conducted by state police) on a lead fragment found in Egger's window frame after the apparent shooting. Phillips concluded:

> Allegations or threats of same continue at a peak level in this office and controversy and strong feelings exist re SA Egger and SA Naum situation. Matter particularly disruptive on the organized crime squad and to the entire office generally.
>
> This whole controversy has spilled over outside the Bureau and is well known to local and federal officials in the area. The effectiveness of both Egger and Naum has been substantially diminished in this area and the only alternative as I see it is to transfer both of them as soon

---

**16.** Rissen expressed similar concerns to a supervisor the day the report was filed. Phillips orally admonished Naum for the delay and

made a record of the reprimand, noting that it would be taken into account in Naum's performance rating.

as possible. This is essential in order to permit us to return to an orderly efficient operation. Strongly recommend this action be expedited. Since Egger and his family continue to be concerned about real or imagined threats to them, a transfer for them would also probably eliminate this particular problem.

R. at 545 (unpaged submission).

During the following week, Phillips interviewed the individuals whom Egger had indicated had incriminating information about Naum, and either Phillips or Wells interviewed McElhaney and the clerk about McElhaney's alleged threat. In addition, Egger and Phillips exchanged memoranda concerning the laundry list of administrative infractions (including the charge of attending the basketball game) with which Egger was charged. On March 30, Phillips sent the administrative write-up to headquarters, along with Egger's responses and other material. In an accompanying memorandum, Phillips said that based on his inquiries, Egger had "a tendency to misinterpret data available to him and to reach inaccurate conclusions sometimes based on insufficient evidence." R. at 545 (unpaged submission). Phillips also criticized Egger for a propensity for working exclusively with local authorities, and concluded:

> There is no question but what his efficiency and credibility in this office are at extremely low level, and I see no way that he could continue as an Agent in this office. His very presence here is disruptive and continues to have an adverse effect on the efficient and orderly operation of this office.
>
> \*    \*    \*    \*    \*    \*
>
> I recommend this individual be transferred immediately, placed on probation and suspended.

On March 31, Egger solicited Phillips' advice about what to tell the local police about the possibility that the shooting was work-related. Phillips told Egger that his conscience had to be his guide, and again stressed the inadvisability of circulating rumors, especially outside of the Bureau. Egger recalls that Phillips told him to keep Bureau secrets within the Bureau. In a memorandum to file, Phillips stated that he had cautioned Egger and others about spreading rumors.

On April 3, Phillips transferred Egger off of the organized crime squad. Two days later, Egger and Phillips discussed this development in a telephone conversation which Egger again secretly tape-recorded. Egger told Phillips that he had heard of the transfer, and Phillips responded that yes, Egger was being transferred to the fugitive squad "for a while." Egger, harkening back to an earlier conversation between the two, noted that Phillips had told him that the people on the organized crime squad did not want to work with Egger, and wondered whether the same problem existed on the fugitive squad. Phillips answered: "Well, I, I think we can resolve it, we'll just have to ah, you know, you get on a fugitive case or something and you got to have assistance, ah, we'll work out something. Ah, ah, we'll work that out . . . We'll work out something."

On April 13, Phillips advised headquarters that Egger would receive a 90-day warning of unsatisfactory performance. Because Egger was on leave, however, the special performance rating was not sent to headquarters until May 1.[17] Egger's squad supervisor, Harman, was responsible for preparing the performance rating. In late March, he initially recommended a rating of excellent, believing that he was not supposed to take into account Egger's activities that were the subject of pending personnel action against Egger. Phillips told Harman such activities should be taken into account and said that Egger did not deserve a rat-

---

17. Egger was on either annual or sick leave for much of April; his brother had died early that month. Phillips was not pleased with the fact that several times in this period Egger indicated he could report to work on a given day and then failed to report. Moreover, there were disagreements concerning whether to classify certain days of leave as sick leave or annual leave.

ing of excellent. Harman changed the rating to unsatisfactory.

On April 25, Egger's attorney met with a Justice Department official in Washington, D.C. and delivered to him a lengthy report prepared by Egger containing various allegations against FBI personnel. In addition to reiterating previously made accusations, Egger reported additional information which he considered sinister, e.g., that Naum and another agent (later identified as Mullen) had been inspecting Egger's informant files; Naum's delay in preparing the March 10 report; and other matters.

Meanwhile, at FBI headquarters, Phillips' recommendations concerning Egger were being processed through the bureaucracy. On April 7, a headquarters official recommended to his superior that Egger be censured, placed on probation, and suspended for five days because of his unprofessional reaction to the shooting incident. That recommendation was ultimately implemented on May 1. Several days later, a headquarters official recommended that Phillips' request to transfer Egger be granted. Initially, headquarters planned to transfer Egger to the FBI office most in need of agents, but by April 19, it was instead recommended that Egger be transferred to Chicago, Illinois. On May 10, final approval for the transfer having been obtained, Egger was told he was being transferred to Chicago, Illinois. The following day, Egger was given the 90-day warning, rating his performance unsatisfactory, which had since been approved by headquarters. On May 14, a front page story in the Indianapolis Star reported that, according to informed sources, Egger had become a target of abuse and threats for seeking to expose corruption. Similar stories appeared the following days. On May 16, the United States Attorney gave Phillips a copy of the report delivered to Washington on April 25. The same day, Phillips and Egger conversed on the telephone, Egger again secretly taped the conversation. Egger told Phillips that he had received calls from co-workers expressing displeasure with him about the media attention being focused on the situation. Egger again volunteered to take a polygraph to prove he was not leaking information to the press.

On May 17, Phillips sent a memorandum to headquarters which stated, in reference to the newspaper articles, that if one compared the articles with Egger's April 25 report, one could easily conclude that Egger is either directly or indirectly responsible for providing information to the media. The same day, Egger sent a letter to headquarters requesting reconsideration of his transfer due to his hardship status in Indianapolis.

The next day, though on sick leave, Egger voluntarily went to Phillips' office to discuss the newspaper articles and signed a waiver of rights form. After learning that Egger was on medication, Phillips decided not to interrogate Egger regarding the matter at that time.

On May 19, in apparent response to Egger's request to reconsider the transfer decision, Phillips again informed headquarters of his belief that Egger could not function effectively in the Indianapolis Field Office, noting that most personnel in the office believed Egger was responsible for giving information to the press and thus Egger would be a "constant source of controversy" in the office, even if Egger were not in fact responsible for leaks.

On May 22, Egger's attorney sent a letter to Congressman Andrew Jacobs explaining Egger's plight. Sometime in this period, Senator Birch Bayh was also contacted.

On May 23, Egger returned to work and was called into Phillips' office to meet with Phillips and the new Assistant Special Agent in Charge.[18] Their attempts to interrogate Egger about press leaks were fruitless: Egger refused to respond to specific questions without his attorney present. Phillips told Egger that if he refused to cooperate, he could be found insubordinate and dismissed. Egger still refused to respond, so Phillips asked whether Egger would cooperate under assurances of immu-

---

18. Wells had retired in April.

nity from prosecution. Egger remained steadfast in his refusal to discuss the matter with Phillips without his attorney being present.

The next day, Phillips reported to headquarters that Egger vigorously denied leaking information to the press and that he volunteered to take a polygraph to exonerate himself. Phillips indicated that it was possible that Egger was not responsible for the leaks and listed other possible sources of the news stories. Several days later, in a memorandum to OPR, Phillips said there was a strong possibility that the Marion County prosecutor's office could be furnishing the press with information about the controversy.

Meanwhile, Egger's request for reconsideration of his transfer was being processed in Washington. The responsible official recommended that the request be denied, stating that Egger's family situation did not then (nor did it in 1973) warrant a hardship assignment to Indianapolis. On June 1, Egger was informed that his request had been denied.

On June 5, the Assistant Director of the FBI advised Phillips and Egger that he would be arriving the next day to investigate Egger's complaints. This investigation apparently occurred as a consequence of letters from Congressman Jacobs and Senator Bayh to FBI Director Webster.

The Assistant Director came to Indianapolis with a team of investigators, interviewed Egger and his attorney, and other personnel in the Indianapolis Field Office, including those whom Egger requested that the team interview. During this period, Egger submitted a new report, attaching an additional ninety-five pages of exhibits. In this latest report, in addition to reiterating charges against Naum and McElhaney previously brought to the attention of Phillips and through him to FBI headquarters, Egger accused Mullen of complicity with Naum in examining Egger's informant files, charged that Wells had intimidated into silence the clerk whom McElhaney had allegedly told to give Egger the silent treatment, implied that Phillips was prejudiced against Egger and had been dishonest with

him, and, "for the sake of completeness," R. at 112, reported a comment made to him by Special Agent Guio which Egger thought might be a subtle threat.

On June 8, apparently while the Assistant Director was still in Indianapolis, Phillips prepared a memorandum recommending Egger's immediate dismissal. Indicating that a transfer would only be a temporary solution, Phillips stated that he found Egger to be "insubordinate, arrogant, uncooperative, devious, untruthful, unpredictable, eccentric, unreliable," and disliked and distrusted by most of his fellow workers. R. at 545 (unpaged submission). With respect to Egger's accusations against his co-workers, Phillips noted that OPR had examined the charges and said his own inquiries either failed to confirm the accusations or proved them groundless. Phillips concluded: "However, I certainly welcome OPR's again examining in detail these matters, notwithstanding the fact that the investigative reporters at the 'Indianapolis Star' may very well publish the fact that such inquiries imply that SA Egger's complaints have validity. Nevertheless, I accept the possible need for additional inquiries." *Id.*

While the Assistant Director was in Indianapolis, Egger was requested to provide additional information on his hardship situation, including the distances between Chicago, Cincinnati, and other cities, and Indianapolis. Egger provided the information, and in response to Egger's June 21 letter stating that his family situation precluded him from reporting to Chicago, the Director of the FBI instructed Phillips to tell Egger that if he reported to Chicago as ordered, the Director would give serious consideration to transferring him to Cincinnati instead, closer to Indianapolis. Egger rejected that alternative, refused to report to Chicago on June 26, and was dismissed from the FBI. Egger appealed his dismissal to the Director. In his July 31, 1978 letter denying the appeal, the Director stated that the dismissal was based solely on Egger's failure to report to Chicago as ordered and stated that the transfer decision was based solely on his loss of effectiveness in the

Indianapolis office and the needs of the Bureau.

In retrospect, Phillips states in his declaration under penalty of perjury [19] that his sole motivation in taking actions regarding Egger was to ensure the effective operation of the Indianapolis Field Office and that the transfer of Egger was necessary because Egger had lost his effectiveness in that office. Other agents in the office attest to the disruptive effect of Egger's presence in the office as well.

Egger does not dispute that many agents in the office did not trust him and did not want to work with him. Nor does Egger submit any affidavits which challenge the conclusion that he had lost his effectiveness in the Indianapolis office.[20]

## V

### The Waiver Theory and other Red Herrings

■ Appellee's attempt to revitalize the waiver theory of employees' constitutional

---

**19.** The declaration was not sworn to before an officer authorized to administer oaths and hence, by definition, was not an affidavit, and the fact that the declarant recited that the statements were made under penalty of perjury does not transform an unsworn statement into an affidavit, *Robbins v. United States,* 345 F.2d 930, 932 (9th Cir.1965); *see also, Local Union No. 490, United Rubber, Cork, Linoleum & Plastic Workers of America v. Kirkhill Rubber Co.,* 367 F.2d 956, 958 (9th Cir.1966) (dictum) (declaration under penalty of perjury "inadequate" under Rule 56(e)). While unsworn statements may not be considered in ruling on summary judgment, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970); *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir.1980), plaintiff neither moved to strike nor otherwise objected to the district court's reliance on the declaration, nor did plaintiff raise the issue in his pro se briefs on appeal, nor did counsel for plaintiff raise the question during the en banc rehearing. Formal defects in an affidavit, *e.g.,* statements not based on personal knowledge, are waived if not objected to in the district court. *Klingman v. National Indemnity Co.,* 317 F.2d 850, 854 (7th Cir.1963); *Scharf v. United States Attorney General,* 597 F.2d 1240, 1243 (9th Cir. 1979); *United States v. Dibble,* 429 F.2d 598, 603 (9th Cir.1970) (concurring opinion) (citing additional authority for "well settled rule that affidavits not in compliance with Rule 56(e) may be considered by the trial court in the absence of an objection by counsel."); *Associated Press v. Cook,* 513 F.2d 1300, 1303 (10th Cir.1975). *But see Williams v. Evangelical Retirement Homes,* 594 F.2d 701, 703–04 (8th Cir.1979) (per curiam) (dictum) (implying possible sua sponte duty if defect is manifest). However, a district court certainly has discretion to disregard affidavits not in compliance with Rule 56(e) even in the absence of objection. *City Federal Savings & Loan Association v. Federal Home Loan Bank,* 600 F.2d 681, 687–88 (7th Cir.1979). It is at least questionable whether the waiver principle enunciated in the foregoing cases applies in this situation, since as we have said, the declaration was not an affidavit. For several reasons, we believe in the circumstances of this case it would be inappropriate for this court to disregard the declaration. First, of course, plaintiff has *never*

raised the point. Under similar circumstances, the Ninth Circuit merely noted the problem but did not pass on it, *Arney v. United States,* 479 F.2d 653, 658–59 n. 4 (9th Cir.1973). Second, we observe that declarations under penalty of perjury are apparently permitted under Indiana practice, *see* Ind.Tr.R. 11(B) & (C), and that plaintiff was represented below by Indiana counsel, who presumably is accustomed to that practice. Third, while we do not pass on the question of whether failure to move to strike such a declaration would prevent raising the issue on appeal, at least in the circumstances of this case, the waiver principle counsels against ignoring the declaration. Lastly, we note that defendant's sworn answers to plaintiff's interrogatories are duplicative of many of the statements made in the declaration.

**20.** Egger does make a feeble effort to cast doubt on this point. Egger points to the April 5 telephone conversation concerning his transfer to another squad. See *supra* at 308–309. That conversation, however, merely reinforced the fact that Egger indeed was having problems with his co-workers and that his utility in the Indianapolis office was diminished. Phillips did not say that the agents on the other squad found the prospect of working with Egger satisfactory, but rather said they would work out something. Moreover, in light of Phillips' pending requests to transfer Egger out of the office, we think that Phillips' statement merely reflected an attempt to arrive at a short-term solution to the problem, trying to keep matters under control until the transfer out of Indianapolis was finalized. Lastly, Egger's own contemporaneous statements provide an eloquent commentary on his status in the office, and the disruption in the office generally. Passions in the office were at the boiling point; Egger thought half the office found the shooting incident humorous; people were giving Egger the "silent treatment"; etc. Lastly, we do not view squad supervisor Harmon's initial evaluation of the quality of Egger's work as casting doubt on Egger's loss of effectiveness in the office. We think the quality of Egger's individual work is a discrete question from his utility to the office. Harmon now agrees that his initial conception of the proper factors relevant to rating Egger's performance was too narrow.

rights in this case provides a particularly apt starting point for our analysis of the merits. Justice Holmes' articulation of this theory was made in a case analogous to the instant one, and endured for over half a century:

> The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him.

*McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517–18 (1892). The theory that public employment may be conditioned on the relinquishment of constitutional rights has been abandoned and it has been clear for many years that the First Amendment's freedom of speech clause constrains public employers in their personnel decisions. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).[21] Thus, appellee's reliance on the waiver theory must fail.

▆▆ Moreover, it is clear that a civil servant need not establish a legitimate claim of entitlement to continued employment in order to state a claim of abridgement of his freedom of speech by his public employer. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Endicott v. Huddleston,* 644 F.2d

1208, 1214–15 (7th Cir.1980). Under this principle, as the panel observed, the fact that Egger may have had no entitlement to continued assignment in Indianapolis is irrelevant to his substantive First Amendment claim. *E.g. McGill v. Board of Education,* 602 F.2d 774 (7th Cir.1979).[22] Thus, the district court accorded unwarranted significance to the fact that Egger had agreed to be transferred anywhere the needs of the service might demand.

The district court also erred in characterizing the FBI as a para-military organization if it was thereby suggesting Egger's constitutional rights could be subject to constraints appropriate in a military environment. *See generally Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (analyzing special status of military personnel's constitutional rights). We have repeatedly rejected invitations to analogize state and local law enforcement agencies to military forces for purposes of analyzing the police officers' liberties, *Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976); *Bence v. Breier,* 501 F.2d 1185, 1192 (7th Cir.1974), *cert. denied,* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975); *Muller v. Conlisk,* 429 F.2d 901, 904 (7th Cir.1970); *accord, e.g., Barrett v. Thomas,* 649 F.2d 1193 (5th Cir.1981); and we believe the analogy is inappropriate in the case of the FBI as well. In short, FBI agents, like "policemen . . ., are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).[23]

---

21. It has never been maintained, of course, that public employees may be subjected to sanctions, unrelated to their employment, for their speech. Even under the Holmes view, the most the government could do to an employee on the basis of his speech was to terminate his employment; it could not impose criminal or civil fines on such an individual because of his speech simply because he was a public servant. Thus, to say that public employees were once required to relinquish their freedom of speech is much too broad a characterization of prior doctrine.

22. Such an entitlement would be necessary for Egger to assert a procedural due process claim,

*e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); but we do not interpret the district court's discussion of this point as being directed toward Egger's procedural due process claims.

23. We may be placing undue emphasis on the district court's use of the term para-military. If the district court was only suggesting that the nature of the work performed by the FBI is a relevant consideration in assessing Egger's claims, *cf. Muller v. Conlisk, supra,* 429 F.2d at 904 ("To the extent that being a policeman is public employment with unique characteristics,

Lastly, we believe that the defense enunciated in *Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (employer prevails upon proving that the same action would have been taken in the absence of the protected conduct by the employee) is not viable in this case. Appellee claims that Egger was transferred due to his loss of effectiveness in the Indianapolis office and the disruptive effect of his presence there. The office unrest and Egger's co-workers' mistrust of him were largely the results of his speech. On this record, appellee simply could not maintain that the same action—a transfer—would have been taken in the absence of Egger's charges against Naum and others; the rationale for that action and the timing of that action were inextricably tied to Egger's speech. While the reaction of Egger's co-workers in the Indianapolis Field Office to the controversy surrounding Egger and Naum does suggest some preexisting disenchantment with Egger on their part, we do not see how appellee could maintain on this record that Egger's problems with the personnel in the office would have required a

transfer had Egger kept his suspicions about Naum to himself.

## VI

While public employees do not forfeit their protection against official abridgement of their freedom of speech by virtue of the employment relationship, and while adverse personnel decisions may constitute such an abridgement, a kernel of the view expressed by Justice Holmes remains, albeit under a quite different analytical rubric. Quite simply, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).[24]

If the plethora[25] of cases in which courts are with increasing frequency[26] being

---

the right of the employee to speak ... may be more or less limited. It is not, however, destroyed."); *see infra* at 319–320; our difference with the district court is basically one of word choice.

**24.** While such ad hoc balancing tests are often criticized by commentators, *e.g.,* Emerson, *Toward a General Theory of the First Amendment,* 72 Yale L.J. 877, 912 (1963), it seems tautological that reconciling these competing societal interests admits of no other approach.

**25.** *E.g., Borrell v. United States International Communications Agency,* 682 F.2d 981 (D.C. Cir.1982); *Foster v. Ripley,* 645 F.2d 1142 (D.C. Cir.1981); *Lesar v. United States Department of Justice,* 636 F.2d 472 (D.C.Cir.1980); *Tygrett v. Washington,* 543 F.2d 840 (D.C.Cir.1974), *appeal after remand,* 627 F.2d 1279 (1980); *Meehan v. Macy,* 425 F.2d 469 (D.C.Cir.1968), *aff'd en banc,* 425 F.2d 472 (1969); *Santos v. United States Customs Service,* 642 F.2d 21 (1st Cir.1980); *Abebisher v. Ryan,* 622 F.2d 651 (2d Cir.1980); *Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17 (2d Cir. 1979); *Monsanto v. Quinn,* 674 F.2d 990 (3d Cir.1982); *Gasparinetti v. Kerr,* 568 F.2d 311 (3d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir.1976), *cert.*

*denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Roseman v. Indiana University,* 520 F.2d 1364 (3d Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976); *Henrico Professional Firefighters Association v. Board of Supervisors,* 649 F.2d 237 (4th Cir. 1981); *Delong v. United States,* 621 F.2d 618 (4th Cir.1980); *Cooper v. Johnson,* 590 F.2d 559 (4th Cir.1979); *Shaw v. Board of Trustees,* 549 F.2d 929 (4th Cir.1976); *Jannetta v. Cole,* 493 F.2d 1334 (4th Cir.1974); *Chitwood v. Feaster,* 468 F.2d 359 (4th Cir.1972); *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982); *Van Ooteghem v. Gray,* 654 F.2d 304 (5th Cir.1981) (en banc) (per curiam), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982); *Barrett v. Thomas,* 649 F.2d 1193 (5th Cir.1981), *cert. denied,* 456 U.S. 925, 936, 102 S.Ct. 1969, 1992, 72 L.Ed.2d 440, 455 (1982); *Bickel v. Burkhart,* 632 F.2d 1251 (5th Cir.1980); *Williams v. Board of Regents,* 629 F.2d 993 (5th Cir.1980), *cert. denied sub nom., Saye v. Williams,* 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981); *Schneider v. City of Atlanta,* 628 F.2d 915 (5th Cir.1980); *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Kingsville Independent School District v. Cooper,* 611 F.2d

**26.** See note 26 on page 314.

called upon to confront this problem is any indication, these interests often come in conflict with one another. Furthermore, as might be predicted in such a judgmental area, the cases often come in conflict with one another as well. Applying this wealth of authority to the facts of this case, we hold that appellee met his burden of establishing that he is entitled to judgment as a matter of law on two alternative[27] grounds: (1) Phillips' actions toward Egger did not abridge Egger's freedom of speech, and (2) assuming arguendo that Egger's rights were violated, Phillips could not have reasonably been expected to know at the time that his actions constituted a violation of Egger's right of free speech, thus sustaining a qualified immunity defense.

### Qualified Immunity

■ We first consider the qualified immunity question, which need detain us only briefly. In light of *Harlow v. Fitzgerald, supra,* decided after the panel opinion in this case, we think it is clear that Phillips prevails on a qualified immunity defense in this case. Phillips met his burden of pleading this affirmative defense, *see id.* 102 S.Ct. at 2737, and he prevails on that defense because his conduct did "not violate clearly established rights of which a reasonable person would have known," *id.* Under *Harlow,* Phillips' subjective motivation is not relevant to the qualified immunity

1109 (5th Cir.1980); *Porter v. Califano,* 592 F.2d 770 (5th Cir.1979); *Kaprelian v. Texas Woman's University,* 509 F.2d 133 (5th Cir. 1975); *Smith v. United States,* 502 F.2d 512 (5th Cir.1974); *Moore v. Winfield City Board of Education,* 452 F.2d 726 (5th Cir.1971); *Hetrick v. Martin,* 480 F.2d 705 (6th Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973); *Endicott v. Huddleston,* 644 F.2d 1208 (7th Cir.1980); *Yoggerst v. Stewart,* 623 F.2d 35 (7th Cir.1980); *McGill v. Board of Education,* 602 F.2d 774 (7th Cir.1979); *Eichman v. Indiana State University Board of Trustees,* 597 F.2d 1104 (7th Cir.1979); *Hanneman v. Breier,* 528 F.2d 750 (7th Cir.1976); *Brubaker v. Board of Education,* 502 F.2d 973 (7th Cir.1974), *vacated,* 527 F.2d 611 (1975) (en banc), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Bence v. Breier,* 501 F.2d 1185 (7th Cir.1974), *cert. denied,* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975); *Clark v. Holmes,* 474 F.2d 928 (7th Cir.1972), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Donahue v. Staunton,* 471 F.2d 475 (7th Cir. 1972), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488 (7th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973), 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *Muller v. Conlisk,* 429 F.2d 901 (7th Cir.1970); *Nathanson v. United States,* 630 F.2d 1260 (8th Cir. 1980); *Atcherson v. Siebenmann,* 605 F.2d 1058 (8th Cir.1979); *Simpson v. Weeks,* 570 F.2d 240 (8th Cir.1978), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1980); *Byrd v. Gain,* 558 F.2d 553 (9th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Kannisto v. City & County of San Francisco,* 541 F.2d 841 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Phillips v. Adult Probation Dept.,*

491 F.2d 951 (9th Cir.1974); *Key v. Rutherford,* 645 F.2d 880 (10th Cir.1981); *Schmidt v. Fremont County School District No. 25,* 558 F.2d 982 (10th Cir.1977); *Mitchell v. King,* 537 F.2d 385 (10th Cir.1976); *Waters v. Chaffin,* 684 F.2d 833 (11th Cir.1982).

26. The increasing number of such cases may be a result of *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), in which the Court held that the freedom of speech follows public employees into the office, and protects their expressions of opinion in the workplace as well as their off-duty speech. While most supervisors would presumably be unaware of most of their employees' expressions off the job, particularly in impersonal metropolitan environments, unless a particular employee had gained some celebrity, supervisors and employees regularly converse on the job, of course, and the intraoffice rumor mill provides an additional source of information, albeit unreliable, concerning who said what about whom in the office. Many, if not most employees confronted with an adverse personnel action would probably not be hard-pressed in remembering something they once said either to their supervisors or to co-workers which rubbed the boss the wrong way.

27. Although the qualified immunity ground would constitute an adequate basis upon which to affirm the judgment below, we nevertheless consider it appropriate to address the merits of the First Amendment claim. Egger certainly has standing to raise that claim, and to dispose of the case solely on the ground that at the time of the alleged constitutional violation the right in question was not clearly established would leave the status of such a right in limbo.

question, and thus Egger's contention that Phillips' intention was malicious, while germane under the authority controlling at the time of the panel decision, *Butz v. Economou, supra,* is no longer an issue on that question. Rather, the question is whether Phillips could have reasonably been expected to know at the time he made his recommendations that the Constitution forbade his actions. Stated another way, the question is whether the law was clearly established at the time.

After examining the contemporaneous authority applicable to the situation confronting Phillips, we conclude that a reasonable person in Phillips' position could not have been expected to know in early 1978 that his transfer recommendation would violate Egger's First Amendment rights because of the *interplay* of at least three doctrinal uncertainties. First, until the Supreme Court's decision in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), it was an open question whether public employees' on-the-job expressions were entitled to constitutional protection. Second, given that Egger was in a very real sense performing his official function as an FBI agent in investigating and reporting his suspicions about Naum (who in this respect was a suspect) to his superior, the question of whether Egger was speaking as a concerned citizen and whether his speech touched on a matter of public concern invoking First Amendment protection would have been in doubt to a reasonable person in light of contemporaneous authority. *See Pickering v. Board of Education, supra,* 391 U.S. at 574, 88 S.Ct. at 1737; *see also, Schmidt v. Fremont County School District No. 25, supra,* 558 F.2d at 984–85. Third, a substantial number of cases relied upon the potentially disruptive impact of employee criticism in upholding *discharges* based on speech, *Atcherson v. Siebenmann, supra,* 605 F.2d at 1065 (citing cases); *see also, e.g., Hostrop v. Board of Junior College District No. 515, supra,* 471 F.2d at 492–93. A reasonable person in Phillips' position could conclude that Egger's "accusations of misconduct against [his] co-employees, if

likely to cause serious disharmony in the . . . office, were not subject to constitutional protection," *Atcherson v. Siebenmann, supra,* 605 F.2d at 1065, or *at least* believed that a *transfer* would not constitute an abridgment of Egger's freedom of speech.

In conclusion with respect to the qualified immunity question, we do not decide whether any one of the preceding doctrinal points, standing alone, would enable Phillips to prevail on this issue. Rather, we base our decision on the cumulative effect of the enumerated points, informed by our assessment of the general state of the law at the time—a general assessment necessitated by a test which "focuses on the objective legal reasonableness of an official's acts." *Harlow v. Fitzgerald, supra,* 457 U.S. at 819, 102 S.Ct. at 2739. We believe that one in Phillips' position would reasonably view the relations between Egger and others in the office as strained and, notwithstanding the root cause of the strained relations, it would appear to a reasonable person that a transfer recommendation would be lawful. *Compare Pauley v. United States,* 419 F.2d 1061, 1067 (7th Cir.1969) ("[I]t seems indisputable[ ] that 'strained personal relations' between an employee and his co-workers 'would appear to provide a permissible basis for a transfer . . . .' ") (citation omitted).

### *Freedom of Speech: The Pickering Calculus*

■ While *Pickering* identifies certain relevant factors to guide us in determining whether Phillips' actions toward Egger constituted an abridgment of Egger's freedom of speech, it must be remembered that in view of the enormous variety of circumstances in which statements by public employees may be thought by their superiors to furnish the grounds for personnel action, the Supreme Court has deemed it inappropriate and infeasible "to attempt to lay down a general standard against which all such statements may be judged." *Pickering v. Board of Education, supra,* 391 U.S. at 569, 88 S.Ct. at 1735. Instead, "in the course of evaluating the conflicting claims of First Amendment protection and the

need for orderly [public] administration in the context" of the case before it, the Court indicated the "general lines along which an analysis of the controlling interests should run." *Id.*

### The Substance of the Communication

We begin our *Pickering* analysis with an assessment of the way in which Egger's speech touched upon matters of public concern and the extent to which his speech dealt with internal matters within the workplace of a more personal and parochial nature. *See, e.g., Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. at 1734; *Clark v. Holmes, supra,* 474 F.2d at 931; *McGill v. Board of Education, supra,* 602 F.2d at 777; *Foster v. Ripley, supra,* 645 F.2d at 1148. The fact that Egger expressed certain views within the workplace as opposed to expressing those views publicly does not mean that this factor in the *Pickering* balance is irrelevant, *see Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), rather, this factor may be particularly salient in such internal settings.

Naturally the protection of the First Amendment does not depend on a judicial conception of the "social worth" of ideas, *see Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), but it is nevertheless necessary in this context to examine the content of the speech in question, *Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4. While some cases indicate that certain speech which relates to peculiarly internal matters of governmental employment does not invoke First Amendment protection, making a *Pickering* balance unnecessary, *e.g., Key v. Rutherford, supra,* 645 F.2d at 884; *Schmidt v. Fremont County School District No. 25, supra,* 558 F.2d at 984–85; in our view such a position is unsound. *Waters v. Chaffin, supra,* 684 F.2d at 838 n. 11 (observing that content based exceptions to freedom of speech limited to obscenity, non-obscene child pornography, malicious libel, and fighting words, citing cases). Re-

gardless of the social worth of the speech, we believe the *Pickering* calculus determines whether there has been an abridgment of the freedom of speech in the employment context. Indeed, the courts which suggest otherwise in our view are merely *sub silentio* striking the *Pickering* balance in cases which are probably too clear to require extended analysis. *See generally Van Ooteghem v. Gray, supra,* 654 F.2d at 306.

■ "[T]he nature of the [employee's] communication is relevant to the balancing of the interests of the employee as citizen against the interest of the governmental unit," *Williams v. Board of Regents, supra,* 629 F.2d at 1003, because a multitude of personnel decisions are of course properly based on what an employee says and how he says it. From the interview with an applicant for a position to discussions with the employee about the proper discharge of his duties, the content of an employee's speech naturally affects his superior's assessment of him and forms the basis of personnel decisions. In some sense even these kinds of communications—based on the substantive work to be performed—are matters of public interest, but making employment decisions based on such speech is plainly permissible. The state is simply acting in its capacity as an employer. Speech which triggers the more difficult *Pickering* problems is that which implicates questions which are not of essentially institutional concern or of personal concern to the individuals involved, but speech which implicates broader interests with societal ramifications. Once such an interest is identified, adverse speech-based personnel actions are scrutinized more closely. Such speech is not only less likely to have a close nexus with the primary legitimate basis for personnel decisions—the effectiveness of the employee in performing his duties—but further, is that in which the employee has an interest as a citizen.

In assessing whether the speech touches upon a matter of public concern, it is important not to equate the public's curiosity about a matter with a matter having socie-

tal ramifications. People may be interested in any number of aspects of the lives of public officials and employees, but that does not mean that such matters have societal ramifications. Conversely, the public may be extremely apathetic about certain matters of public concern, but the unpopularity of the issue surely does not mean that a voice crying out in the wilderness is entitled to less protection than a voice with a large, receptive audience.

Some cases indicate, however, that the public's interest in the communication is an important consideration. The Third Circuit maintains that the fact that the public is interested in the employee's speech, "as evidenced by the local news media's assessment that the communication is newsworthy," means that increased judicial scrutiny of speech-based personnel actions is warranted. *Monsanto v. Quinn, supra,* 674 F.2d at 997. In the Third Circuit's view, then, the *Pickering* balance may turn in large measure on the ability of the employee to "convince[ ] local news media that her grievance . . . [is] newsworthy." *Roseman v. Indiana University, supra,* 520 F.2d at 1368 n. 11. In the instant case, Egger was very successful in this regard: he made quite a splash in the papers, which painted him in heroic colors—the little guy bucking the system. We do not believe, however, that the scope of an employee's freedom of speech can turn on his ability to convince a newspaper to print a story about his plight. The factors which determine whether a story is newsworthy are hardly coterminus with the factors which determine whether the communication has societal ramifications, and in any event, newspaper editors cannot decide the question for us.[28]

Our assessment of Egger's communications is that in some respects they involved matters of public concern, and in other respects they implicated institutional matters. To the extent that Egger reported his opinions about the alleged wrongdoing by Naum, his speech certainly raised an issue of societal interest: the professional integrity of one of the nation's law enforcement officials. *See, e.g., Foster v. Ripley, supra,* 645 F.2d at 1148; *Porter v. Califano, supra,* 592 F.2d at 773. *Cf.* 5 U.S.C. § 2302(b)(8)(A) (expression of public policy in favor of employee's exposing official malfeasance and misfeasance). While Egger's accusations were directed against an individual, they were not the kind of personal criticism of a co-worker, *e.g.,* carping comments about personal characteristics or traits, that essentially are of private concern among the individuals involved, *see, e.g., Bickel v. Burkhart, supra,* 632 F.2d at 1257; *but see, Jannetta v. Cole, supra,* 493 F.2d at 1337 n. 5. Rather, Egger's charges that Naum committed perjury and was accepting bribes implicated Egger's interests as a concerned citizen. *See generally Kannisto v. City and County of San Francisco, supra,* 541 F.2d at 844. Nevertheless, the personal nature of the accusation is of course relevant. Criticism directed against a fellow employee, even if it raises issues of general concern, necessarily implicates different interests of the state in its employment capacity than would an impersonal criticism of the institution generally. *See Bickel v. Burkhart, supra,* 632 F.2d at 1256–57.

Moreover, a significant factor in this case is that Egger's job as an FBI special agent was to investigate criminal activities. In this respect, his accusations against Naum, and others, must be considered in a different light. While any employer confronted with work-related accusations against one of his subordinates should either conduct inquiries or notify appropriate officials—and there is no dispute that Phillips did both in this case—in the work environment of this case, additional factors come into play. Phillips was entirely justified in evaluating the soundness of Egger's investigative technique, the inferences he drew from certain informant statements, and the overall soundness of his conclusion that certain leads were worth pursuing. From this per-

---

**28.** One might also wonder whether the Third Circuit would value the editorial judgment of a scandal sheet on a par with that of a reputable, or even highly prestigious publication, and if not, just how it would justify a distinction.

spective, Egger was simply doing his job as a criminal investigator, and the quality of that work was something Phillips routinely had to assess. Phillips necessarily evaluated the soundness of Egger's detective work regarding Egger's allegations against Naum in this professional environment. To the extent that the disagreements between Egger and Phillips represent a professional difference of opinion regarding the strength of the case against Naum, Egger's communications could be viewed as evidence of a lack of professional competence, and a recommendation based on such an assessment of the communications implicates internal agency concerns. *See generally Pickering v. Board of Education, supra,* 391 U.S. at 573 n. 5, 88 S.Ct. at 1737 n. 5.

Just as Egger's core allegations against Naum implicate matters of both public and internal institutional concern, other communications by Egger admit of the same dual character. Many of the communications can be viewed as expressing a criticism of the institutional response regarding various matters, *e.g.,* the charge that he attended the basketball game, the status of the OPR investigation, his response to the shooting incident, the failure to conduct a RICO investigation, and similar matters. However, there is a difference between criticism directed at the institution in general and disputes with which the complainant has an intimate personal involvement. At times, particularly regarding the shooting incident, Egger was simply uncooperative, and the fact that his verbalized reason for that attitude was a criticism of the institution does not significantly alter the essentially private nature of the dispute. *Cf. Chitwood v. Feaster, supra,* 468 F.2d at 361.

### The Time, Place, and Manner of the Communication

The time, place, and manner of Egger's communications are also relevant to the *Pickering* calculus in the case of private expressions made in the workplace. *Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4. Egger was obviously disturbed by the lack of action on the part of OPR and Phillips in response to his allegations against Naum and others, and did not keep his impatience a secret. Instead, he inundated Phillips with a series of largely redundant communications, both orally and in writing. While Egger could not be deemed to be forcing his ideas on an unwilling recipient, *see id.* at 415, 99 S.Ct. at 696, the sheer number of the communications and their repetitive nature are relevant considerations. It obviously swallowed up a considerable amount of time to prepare the memos, for Phillips to read them and discuss them with Egger and to discuss the continuing controversy with his superiors in Washington. Dogged determination in pursuing new leads is one thing, but Phillips continually asked Egger whether he had any new information or whether he was merely rehashing information provided to OPR. Egger persisted in making allegations that were at most variations on the same theme. We do not suggest that these aspects of Egger's speech standing alone would independently justify a transfer. Instead, we believe that in some respects, this consideration weighs against Egger in the *Pickering* balance.

Lastly, one other aspect of the time, place, and manner of Egger's communications is important in this case. Egger first shared his suspicions about Naum with Mullen, who in turn was to discuss the matter with Special Agent in Charge Lowie. Naum soon learned of the accusation *and* the identity of his accuser. In sharp contrast to the procedure employed by the individual who accused Egger of wrongdoing in connection with the basketball game, Egger did not discreetly approach the Special Agent in Charge and request anonymity. Now it may well be that Egger shared his suspicions about Naum with Mullen with either the explicit or implicit understanding that Naum would not be informed. But Naum was informed, and wherever the responsibility may be placed for that development, it surely cannot be traced to Phillips who was not even transferred to the Indianapolis office until February. In hindsight, it seems plain that Egger was im-

provident at best in making a personal accusation against Naum to a fellow agent. *See generally, Santos v. United States Customs Service, supra,* 642 F.2d at 25–26. This aspect of the manner in which Egger made his charge is relevant to the *Pickering* analysis because it determined in large measure the nature and scope of office disruption which resulted from Egger's speech.

*Interests of the Government as Employer*

We next assess the special interest of the employer in regulating the speech of its employees. While the employer has a general interest in maintaining a work environment conducive to effectuating the agency mission, under the *Pickering* calculus certain aspects of the particular employment milieu are especially germane. In *Clark v. Holmes, supra,* 474 F.2d at 931, we summarized these state interests as follows:

> (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence.

While these interests are ever present, their strength and applicability in any given employment situation depend on both the nature of the tasks performed by the particular employee and the mission of the agency for which he works. Harmony is particularly required among employees who frequently are required to work on joint projects and the importance of avoiding disharmony among such workers is particularly acute in certain types of endeavors.

In the instant case, all of the state interests enunciated above are particularly acute, both because of the need for teamwork among agents and the high stakes that are involved in law enforcement. The caselaw appears unanimous in recognizing the salience of these interests in the context of state and local law enforcement agencies, *e.g., Waters v. Chaffin, supra,* 684 F.2d at

839; *Barrett v. Thomas, supra,* 649 F.2d at 1198; *Bickel v. Burkhart, supra,* 632 F.2d at 1257 (dictum); *Byrd v. Gain, supra,* 558 F.2d at 554; *Kannisto v. City and County of San Francisco, supra,* 541 F.2d at 843; *Hanneman v. Breier, supra,* 528 F.2d at 754–56; *Muller v. Conlisk, supra,* 429 F.2d at 904–05; *Meehan v. Macy, supra,* 425 F.2d at 470–71; *see Kelley v. Johnson,* 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976) (acknowledging legitimate interest in maintaining discipline and *esprit de corps* among police officers); *Tygrett v. Barry, supra,* 627 F.2d at 1283; *cf. Janusaitis v. Middlebury Volunteer Fire Department, supra,* 607 F.2d at 26 (applying principle to firefighters); *see generally* Finck, *Nonpartisan Speech in the Police Department: The Aftermath of Pickering,* 7 Hastings Con. L.Q. 1001 (1980). Analogously, the interests are also particularly salient in the FBI employment setting. Mutual trust and respect among agents and between agents and supervisory personnel are particularly important in law enforcement. The need for confidentiality cannot be gainsaid. And given the high stakes involved—sometimes life and death decisions are made—the risks of disharmony can be grave.

Egger himself points to one example of the dangers inherent when law enforcement officials mistrust one another. Naum, we are told, intentionally withheld information from Egger which endangered Egger's life. For our illustrative purposes, it matters not what Naum's actual motivation for that failure was. (Egger believes that Naum illicitly wanted to stymie Egger's gambling investigation.) A particularly likely reason for an FBI agent to refuse to share information with a colleague is that he mistrusts him—fearing that he will divulge the information to outsiders. Indeed, given Egger's mistrust of Naum and others, it is plain that Egger would not share information he had with agents whom he believed could not be trusted. Egger was in fact greatly disturbed when he thought that Naum and Mullen had been examining his files—imputing sinister motives to them—whereas he evidently thought it appropriate to examine Naum's files in the

routine course of his investigation of organized crime. While other illustrations of the importance of teamwork and mutual trust in the law enforcement setting are apparent in this record, we need not belabor the point for we think the proposition is beyond dispute.

### Arriving at the Pickering Balance on a Motion for Summary Judgment

Summary judgment should be employed sparingly in First Amendment cases such as the instant one. *E.g., Foster v. Ripley, supra,* 645 F.2d at 1148–49; *Porter v. Califano, supra,* 592 F.2d at 778. One reason these cases are often inappropriate for resolution via summary judgment is that a basic question each presents is a question of intent of the governmental actor: an underlying issue is whether the personnel action was based on legitimate personnel concerns or rather was based on a naked desire to punish an individual for expressing a certain point of view. However, ascertaining such intent is basically an inferential process based on the circumstances surrounding the act and actor in question. *Pickering* identifies the factors which assist a court in determining whether the state employer is punishing an employee merely for expressing an opinion which the employer desires to suppress or instead is responding legitimately to the effects the speech has on the functioning of the agency.[29] In some such cases, the uncontroverted facts will establish that the expression led to an irreparable breach of confidence between an employee and his co-workers and disrupted the efficiency of the governmental unit which *under the circumstances of the particular case* makes summary judgment appropriate.

*E.g., Nathanson v. United States, supra,* 630 F.2d at 1263; *Sprague v. Fitzpatrick, supra,* 546 F.2d at 565.[30]

While Egger argues that Phillips recommended his transfer to retaliate against him for the exercise of his First Amendment rights, that is a mere constitutional abstraction. What Egger really contends is that Phillips' motivation was malicious—that Phillips did not act out of a concern for the effective functioning of the office, but out of a desire to punish him for speaking out. In our view, however, the record in this case does not present a genuine issue of material fact regarding this question.

Phillips, to use Egger's phrase, was thrust into a position not of his making. In his first few weeks in Indianapolis, he was confronted with a series of charges and countercharges between Naum and Egger, whose respective camps had already in large measure been formed. There simply is no dispute in this case that the relationship between Egger and a significant number of the agents in the Indianapolis Field Office, including ultimately Phillips himself, was characterized by mounting mutual mistrust and professional disrespect. Egger, of all people, recognized that the status quo was intolerable and urged Phillips to do something about the situation. Phillips did. He sized up the situation and concluded that the transfer of both Egger and Naum, the principal combatants, was the answer. Naum was easy to get rid of, for he had long desired a transfer to Buffalo. For Egger, on the other hand, a transfer was a burden, not a benefit, a fact which Phillips either knew or should have known. Egger thinks the reason Phillips recommended his

**29.** To elaborate, the *Pickering* analysis can be viewed in part as a search for the real purpose behind the governmental action in question. When an analysis of the nature of the employee's speech and the nature of the special employment interests of a particular agency demonstrates that the speech did not compromise the employee's performance or the efficiency of the office, one infers that any adverse personnel action resulting from such speech was based on a naked desire to punish an individual for expressing a different point of view, that is, the purpose of the personnel action was solely to inhibit speech. When an analysis of these interests demonstrates that the speech would significantly compromise the employee's performance of his duties, one infers that the adverse personnel action was based on a desire to promote the effective functioning of the office.

**30.** We do not suggest that a finding that disruption occurred is dispositive; rather the extent and nature of the disruption, and its effects on the particular workplace involved, must be weighed in the *Pickering* calculus.

transfer turns on Phillips' knowledge of that fact.

However, in view of the rumors, alleged threats, and discord in the office, the mutual distrust between Egger and others, the importance of mutual trust in the FBI employment setting, the lack of Phillips' personal involvement during the inception of the office controversy, the timing of Phillips' initial request to transfer both Egger and Naum, the nature of Phillips' responsibilities as Special Agent in Charge of the office—in short, in the face of all the indicia indicating that Phillips recommended the transfer out of institutional concerns, Egger fails to convince us that he has anything more than a suspicion that Phillips cared enough either about him personally or the charge he made against Naum to want to punish him for speaking out.[31] Eventually, the relationship between Egger and Phillips did deteriorate to the point that there was animosity between them. This may convince Egger that Phillips was out to get him from the start, but in view of the sequence of events, it seems apparent to us that the animosity which developed resulted from Egger's belief that he was being victimized and is not evidence of some pre-existing personal animosity Phillips harbored for Egger.

Nor do we think that Phillips' isolated comment that the Bureau took a dim view of complaints and sometimes transferred all involved is sufficient to create a genuine issue of fact regarding Phillips' motivation. Egger's complaints at that point were that he was being given the silent treatment, Naum was spreading lies about him, the rumors had to stop, and that whoever brought the charge against him regarding the basketball game and vehicle use was attempting to harass him. In the context of those complaints, we do not view Phillips' statement as sinister—as an attempt to stop

Egger from making substantive charges of wrongdoing against Naum. Egger had already made those charges, and OPR had only recently been in Indianapolis to investigate them. Rather than an attempt to threaten Egger, Phillips' statement appears to have been an attempt to inform Egger of the consequences of causing the situation to degenerate into *ad hominem* attacks and an endless series of charges and countercharges. Moreover, Egger's tape recordings of his conversations with Phillips speak for themselves in this regard.

Lastly, we do not view the fact that Phillips ultimately recommended Egger's dismissal on grounds of incompetence as evidence that Phillips wanted to punish Egger for making his charges against Naum. By the time Phillips made that recommendation, a series of altercations between Phillips and Egger had occurred, and both shared a professional disrespect for the other. Now it is true that Phillips made the recommendation when the Assistant Director was making yet another investigation of Egger's complaints, and one certainly could infer that such timing of the recommendation was not a mere coincidence. Rather, this latest episode naturally caused Phillips to confront the situation once again. Up to that point, Phillips had avoided becoming embroiled in the underlying merits of the controversy. Indeed, his approach to the matter reflected his parochial concerns as the agent in charge of the Indianapolis Office—he merely wanted the root sources of the controversy—Egger and Naum—to go elsewhere. Finally, however, as his recommendation indicates, he felt it was his professional responsibility to do more, and not merely let Egger become someone else's problem.

Our conclusion, however, that Phillips was not motivated by a desire to punish

---

**31.** We fail to see how one could conclude on this record that there is a reasonable inference that Phillips recommended Egger's transfer in order to silence him. First, Phillips routinely forwarded all of Egger's complaints to proper authorities and conducted his own investigations as well. Second, given Egger's hardship status, and given Egger's practice of responding to adversity by intensifying his accusations, we fail to understand how Phillips could have reasoned that if Egger was confronted with a *fait accompli* transfer, it would silence him, especially after Egger told Phillips that his greatest fear was being backed into a corner and being forced to go outside the Bureau with his charges.

Egger does not end our inquiry. While Phillips was motivated by a desire to preserve the effective functioning of the Indianapolis Office, it still remains true that Egger would not have been transferred but for his accusations against Naum and others. And from one in Egger's position, it makes little difference what Phillips' subjective motivation was—it must be of little solace to Egger to know that he was not transferred merely for speaking out, but instead because of the foreseeable consequences of his speech. *See Bowen v. Watkins, supra,* 669 F.2d at 987. Of course, as previously noted, a principal reason for the nature and scope of disruption which occurred was that Egger shared his suspicions about Naum with fellow workers and the accusation soon reached Naum and spread throughout the office. *Cf. Foster v. Ripley, supra,* 645 F.2d at 1149. Nonetheless, in this kind of case, it may well almost be inevitable that some office unrest will occur. At the very least, an FBI agent considering such expression would likely weigh the possibility of such unrest—and the possible resulting transfer necessitated by the unrest—before deciding to forward an accusation against a co-worker. The possibility of a transfer no doubt will chill the exercise of the right to make such accusations. But that does not make such transfers unconstitutional. Rather, it means in any case where the transfer is the proximate result of such speech, the governmental action must be scrutinized.

It is often said that in cases where an employee may be subjected to adverse personnel action on the basis of his speech, it is because "in the balance mandated by *Pickering,* the interests of the government outweigh the interests of the speaker and the public, and the speech is unprotected." *Bowen v. Watkins, supra,* 669 F.2d at 987. *See also Clark v. Holmes, supra,* 474 F.2d at 931–32; *McGill v. Board of Education, supra,* 602 F.2d at 777; *Hostrop v. Board of Junior College District No. 515, supra,* 471 F.2d at 492; *Lesar v. United States Department of Justice, supra,* 636 F.2d at 474–76; *but see Henrico Professional Firefighters Association Local 1568 v. Board of Supervi-*

*sors, supra,* 649 F.2d at 243 (suggesting that speech is presumed protected, and *Pickering* calls for a compelling state interest analysis). In cases where the state is asserting an interest as an employer in forbidding the speech in question, the quoted statement may be an accurate reflection of current doctrine, though it may be more instructive to say that the *Pickering* balance is required because the speech *is* protected and the question in any case is whether the particular adverse personnel action in question constitutes an abridgment of the freedom of speech. In this case, however, appellee naturally is not asserting that FBI agents should be forbidden from accusing their co-workers of official wrongdoing, and hence the question in this case is not whether Egger's speech is unprotected in the sense that the disruption such speech is likely to create outweighs the interests of the speaker in commenting on such matters. Moreover, while appellee maintains that Egger's charges ultimately proved unsubstantiated, he does not contend that they were intentionally false or malicious. · *See Pickering v. Board of Education, supra,* 391 U.S. at 574, 88 S.Ct. at 1737. Lastly, while the manner in which Egger voiced his complaints weighs against him in the *Pickering* balance, we cannot say on this record that his approach to the situation was so inappropriate to justify the conclusion that his speech was stripped of First Amendment protection altogether. Arriving at the *Pickering* balance in the context of this case turns not on whether the speech is protected at all, but rather, upon the scope of protection which it is afforded.

■ The First Amendment protects the right of a government employee to make good faith accusations of malfeasance in office against fellow workers, but the First Amendment does not guarantee the employee a cost-free exercise of that right.

One cost of the exercise of that right—and perhaps the cost most likely to chill its exercise—is not imposed by the employer, but by human nature. Common sense dictates that once the object of the accusation learns of it, animosity toward the accuser

results. Once it is known throughout the entire office that two co-workers are enemies—and given the rumor mill in most offices, that probably would be the rule— people will often take sides in the dispute. While the camps may in some cases be equally divided, it would not be surprising to find most individuals siding with the object of the original accusation. The social convention of the office environment discourages such exchanges. The more insubstantial the charge in the collective view of fellow workers the more ostracized the accuser will become. He will be given "the silent treatment" by some,[32] both because the accuser has disrupted the harmony of the workplace, and perhaps, because of the secret fear on the part of some co-workers that they may be the next object of an accusation for some questionable conduct in which they once engaged, like attending a basketball game while on duty. This price of accusatory speech is one Egger knows well, but it is not a price he can pass along to Phillips.

Nor can Egger pass along the cost of his transfer to Phillips. In this case, the *Pickering* balance is clear—the mutual distrust between Egger and many of his colleagues is undisputed, and the need for such trust is vitally important in the specific employment context in this case. Egger had lost his effectiveness in the Indianapolis office and the challenged action—the transfer— was tailored to vindicate the specific state interest at stake. *See Gasparinetti v. Kerr, supra,* 568 F.2d at 315; *cf. Tanner v. McCall, supra,* 625 F.2d at 1189. Indeed, solicitude was given Egger's hardship situation as well. He was transferred to Chicago, not a great deal farther from his rela-

tives than Indianapolis, and was given an opportunity to be transferred to Cincinnati as well. Egger was not satisfied with that balance. He refused to report to Chicago, and was terminated.

Egger now wants Phillips to pay the price of his speech for him, a price he himself was unwilling to pay. He asks for a cost-free exercise of his right. He asks for too much.

### VII

Accordingly, the judgment of the district court is hereby affirmed. Each party shall bear his own costs on this appeal.

CUDAHY, Circuit Judge, concurring in Parts III and V and the result.

Judge Eschbach is to be commended on his exhaustive exploration of all aspects of this multifaceted controversy. I concur in the result reached in light of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow,* which was decided after the panel opinion in this case was issued on February 1, 1982, changed the elements of the qualified immunity defense so as to remove from consideration the question whether the government official acted with malicious intention. Since it was this question which properly precluded the original panel from accepting Phillips' qualified immunity defense, *see Egger v. Phillips,* 669 F.2d 497, 504 (7th Cir.1982), I am inclined to agree that under present standards the qualified immunity defense should prevail. In *Harlow,* the Court held that officials should be granted immunity unless their conduct, at the time it was undertaken, violated "clearly established

---

**32.** Egger seems to take the position that he was ostracized by his fellow employees as a result of, at least in part, McElhaney's statement to a single clerical employee. Egger does not suggest he has any evidence that Phillips directed McElhaney to instruct employees to give Egger the silent treatment, even assuming McElhaney made such a statement. Nor does Egger suggest that McElhaney made such statements to anyone else in the office. Rather, Egger's theory runs something as follows. McElhaney was known throughout the office as being up for a promotion, and when word of his statement to

the clerk circulated around the office, his fellow workers thought it would be in their best interests to avoid Egger. Phillips is culpable, in Egger's view, for failing to take the action which Egger wanted him to take in response to the situation. Precisely what this action would have been is not entirely clear, but we surmise that Egger would have liked Phillips to announce to the agents in the office that they were not to give Egger the silent treatment. The need for such action, and the futility of it, bespeak the need for a transfer quite plainly.

statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 102 S.Ct. at 2737. In the case before us, under the *Harlow* test, Phillips' transfer of Egger seems protected, since it was not until July 1979 that this circuit specifically held that a job transfer, in contrast to a discharge, could be the subject of a first amendment challenge. *McGill v. Board of Education,* 602 F.2d 774, 780 (7th Cir.1979). *See also Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).[1]

In all other respects, however, I adhere to the panel opinion of which I am the author, *Egger v. Phillips,* 669 F.2d 497 (7th Cir. 1982). In particular, I adopt for purposes of this separate opinion the observations made there regarding the difficulties, in a summary judgment context, of sorting out problems of motivation and other questions of state of mind. The problem in the instant case is, of course, to distinguish between Phillips' reactions to Egger as a "whistleblower" and corruption fighter and his reactions to Egger as an eccentric troublemaker.

Also, it may be, as is suggested, that Egger could have avoided some hard feelings and disruption by keeping his complaints against Naum anonymous. *See supra* at 318–319. This approach, however, although practical, seems at the same time furtive and cowardly. It is also unclear to me why Egger should necessarily bear the entire cost of speech that, *if it should prove justified by the facts,* would be manifestly helpful to the public and to the Bureau. *See supra* at 323.[2]

Finally, I am disappointed that the arguments regarding FBI immunity from *Bi-*

*vens* actions and Egger's waiver of his first amendment rights were entertained by this court *en banc.* Neither argument was presented to the panel, though the argument that *Bivens* actions should be denied to FBI agents was the government's foremost contention on rehearing. The government explained lamely in its Petition for Rehearing that the "[*Bivens*] issue was raised by Motion to Dismiss (10/27/78) in the district court but we prevailed there on different grounds and thus did not raise the issue in the court of appeals." Defendant's Petition for Rehearing at 8 n. 6. I need hardly point out the disorder and wasted effort—not to mention denigration of the work of panel members—that result from allowing new arguments to be made and considered on rehearing. Some of the same considerations which argue for solicitude for other tribunals with respect to the exhaustion of claims and remedies argue at least equally for solicitude for the panels of this court. Litigants should not be encouraged to save their most sweeping—if not their most meritorious—claims for the rehearing petition. Although I object to the after-the-fact nature of these arguments, I nevertheless concur here in their rejection on the merits.

I therefore respectfully concur in the result and in Parts III and V of Judge Eschbach's opinion.

POSNER, Circuit Judge, with whom BAUER, HARLINGTON WOOD, Jr., and COFFEY, Circuit Judges, join, concurring.

I join in all but Parts III and V of Judge Eschbach's thorough and meticulous opinion. Part III holds that an FBI agent may bring a damages suit for an alleged viola-

---

**1.** It is not clear to me, under this analysis (assuming that it is correct), how progress in the development of the law is to be accomplished since defendants presumably will be able to avoid liability in unprecedented situations by invoking the *Harlow* defense. Whether a court could recognize a defendant's right to immunity but then go on to hold the conduct complained of illegal for future cases would seem to raise serious Article III problems as well as removing the incentive of plaintiffs to advance contentions requiring a change in the

law. *See Stovall v. Denno,* 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). *See generally Mackey v. United States,* 401 U.S. 667, 675–702, 91 S.Ct. 1160, 1164–1165, 28 L.Ed.2d 404 (Harlan, J., dissenting).

**2.** Whatever else may be said about Egger's concerns, they assumed sufficient public importance and reality to become the subject of a national network television story on the ABC news program, "20/20" (November 4, 1982).

tion of his constitutional rights brought about by a transfer from one FBI office to another. Part V holds that one does not give up his right of free speech by becoming an FBI agent. In view of the disposition of the case, neither Part III nor Part V is essential to the court's decision, and Part III in particular reaches a conclusion that I find difficult to accept. I would think it the better part of valor to avoid trying to resolve either question in this case.

In a recent decision not cited by the court, *Jones v. Reagan,* 696 F.2d 551 (7th Cir.1983), a panel of this court held that members of an army reserve unit could not bring a damages action for alleged violation of their constitutional rights brought about by a transfer from one reserve unit to another. The case is distinguishable from this case on several grounds but I am not convinced that this case should be decided differently, in view of the potential disruptive effect of damages liability on the FBI's ability to maintain discipline and cohesion. I also am not completely persuaded that FBI agents have a First Amendment right to criticize their superiors. The adverse effect of such a right on discipline and cohesion may outweigh the benefits of allowing FBI agents to participate fully in the marketplace of ideas.

If I thought either of these issues was inescapably presented by this case I would roll up my sleeves and grapple with them and maybe in the end would be persuaded by Judge Eschbach's analysis. But since they are at once difficult and inessential I would prefer to see the court defer their resolution until a case arises where they are inescapably presented. As only four of the eight judges voting have joined in Parts III and V, in effect the court *has* deferred their resolution to another day.

COFFEY, Circuit Judge, concurring in part.

I agree with Judges Bauer, Wood and Posner that this court need not resolve the issues addressed in Parts III and V of the plurality opinion. However, I am compelled to write separately as the plurality opinion fails to adequately address the compelling needs of the Federal Bureau of Investigation and indeed all law enforcement agencies, in maintaining the highest degree of esprit de corps, confidentiality, efficiency, discipline and supervision, in fact far greater than those of any other unit of government. In this respect, the interests and needs of law enforcement agencies are closely allied, but not exactly similar to, those of the military. Although I agree that cases pertaining to the constitutional rights of military personnel are not controlling in this case, many of the considerations underlying the military's need for esprit de corps, confidentiality, efficiency, discipline and supervision are equally compelling in the context of civilian police forces. Therefore, I disagree with the plurality's criticism of the district court's statement:

"The district court also erred in characterizing the FBI as a para-military organization if it was thereby suggesting Egger's constitutional rights could be subject to constraints appropriate in a military environment. *See generally, Brown v. Gliens,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (analyzing special status of military personnel's constitutional rights). We have repeatedly rejected the invitations to analogize state and local law enforcement agencies to military forces for purposes of analyzing the police officers' liberties . . . ."

I read the district court's brief statement that the FBI is a "para-military organization wherein security of information, discipline and teamwork are of primary importance" as an analogy recognizing the unique and compelling requirements of law enforcement agencies, and not as a finding that cases relating to the constitutional rights of military personnel are controlling in this fact situation.

I.

The Supreme Court in *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) recognized the unique considerations which come into play when an employment related decision of a police department is

subjected to constitutional challenge. In *Kelley,* a police officer challenged the constitutionality of a police department regulation governing the length of officers' hair. The Court of Appeals for the Second Circuit had held the regulation unconstitutional:

"The court of appeals held that cases characterizing the uniformed civilian services as 'para-military' and sustaining hair regulations on that basis were not soundly grounded historically. It said that the fact that a police force is organized 'with a centralized administration and a disciplined rank and file for efficient conduct of its affairs' did not foreclose respondent's claim, but instead bore only upon 'the existence of a legitimate state interest to be reasonably advanced by the regulation.' "

*Id.* at 241, 96 S.Ct. at 1442. The Supreme Court reversed the Second Circuit and held that the hair length regulation was constitutionally valid. In so holding, the Supreme Court stated:

"[T]he court of appeals [reasoned] that the 'unique judicial deference' accorded by the judiciary to regulation of members of the military was inapplicable because there was no historical or functional justification for the characterization of the police as 'para-military'. But the conclusion that such cases are inapposite, however correct, in no way detracts from the deference due Suffolk County's choice of an organizational structure for its police force. Here the county has chosen a mode of organization which it undoubtedly deems the most efficient in enabling its police to carry out the duties assigned to him under state and local law. *Such a choice necessarily gives weight to the overall need for discipline, esprit de corps, and uniformity.*"

*Id.* at 246, 96 S.Ct. at 1445 (emphasis added).

The Ninth Circuit relied on the *Kelley* holding in a case involving facts similar to this case. In *Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977), a police lieuten-

ant stated, during a morning inspection, that his superior was an "unreasonable, contrary and vindictive individual." Following this statement, the plaintiff was disciplined by the police department for violating its regulation prohibiting "misconduct or any conduct . . . which tends to subvert the good order, efficiency or discipline of this department." The plaintiff brought an action alleging that the police department had violated the First Amendment in disciplining him. The Ninth Circuit rejected this argument and held that the police department's interests in discipline outweighed the plaintiff's First Amendment rights. The court stated:

"It is true . . . that the [police] department has a substantial interest in developing 'discipline, esprit de corps, and uniformity,' *Kelley v. Johnson, supra,* 425 U.S. at 246 [96 S.Ct. at 1445], to ensure adequate 'promotion of safety of persons and property.' "

*Id.* at 843. The court went on to distinguish its holding from the Supreme Court's opinion in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), stating:

"The Court's decision in *Pickering* provides considerable guidance. The plaintiff in *Pickering* was a teacher discharged for submitting a letter to the local newspaper criticizing school board budgetary policies. The Court found that the public statement at issue related to a matter of general public concern and that 'the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication.' . . . The Court concluded that no peculiar state interest arising from the employment relationship was at stake and that Pickering was therefore entitled to the same First Amendment protection afforded the general public.

The *Pickering* Court noted:

'These statements [were] in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of

maintaining either discipline by immediate superiors or harmony among co-workers is presented here. Appellant's employment relationships with the Board and, to somewhat lesser extent, with the superintendent [were] not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence [were] necessary to their proper functioning.'

The Court also emphasized that it was not shown, nor could it be presumed, that the statements at issue 'in any way either impeded the teacher's proper performance of his daily duties in the classroom, or ... interfered with the regular operation of the school generally.'

The facts in this case sharply contrast with those in *Pickering.* Here, Kannisto's comments were directed against one under whose direction he worked in close daily contact. Questions of discipline and harmony are clearly presented here. Kannisto's diatribe, delivered as it was before his men while in formation for inspection, can presume to have had a substantial disruptive influence on the regular operations of the department ... the department's conclusion that this was the case is entitled to considerable deference."

*Id.* at 843–44.

The Eighth Circuit recently discussed the similarities between the military and a civilian police force in *Vorbeck v. Schnicker,* 660 F.2d 1260 (8th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982). In *Vorbeck,* the St. Louis Police Officers Association brought an action alleging that the police department regulations prohibiting conduct "unbecoming to a member of the department" or "contrary to the good order and discipline of the department" were unconstitutionally vague and would "unnecessarily chill the officers' exercise of their constitutional rights." In rejecting this argument, the Eighth Circuit stated:

"[T]he Court [in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)] held that special considerations relevant to military needs warranted a 'broader sweep' in military regulations than might be permissible in a civilian criminal code.

*Police regulations, like military regulations, are generally by necessity cast in broad terms.*

\* \* \* \* \* \*

As illustrated by *Parker* and *Bence* [*v. Breier,* 501 F.2d 1185 (7th Cir.1974)], there is a delicate balance to be struck in cases such as that now before us. Equally legitimate interests appear on both sides of the scale. *On the one side there are the needs of institutions, such as the military and the police, which must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society.*"

*Id.* at 1262–63 (emphasis added).

Based on this case law, the following analysis is mandated in this case. First, it cannot be emphasized too strongly that the interests at issue in this case are entirely different than those in *Pickering.* Here, Egger's allegations of wrongdoing were directed against one with whom he worked in close daily contact and involved a possible disclosure of sensitive agency information. Moreover, Egger's comments directly concerned a co-employee's performance of his duties and thus directly interfered with the confidentiality, esprit de corps and efficient operation of the FBI office, whereas in *Pickering* "the fact of employment [was] only tangentially and insubstantially involved in the subject matter of the public communication." Most importantly, this case involves the FBI, an agency whose sensitive and dangerous duties demand the utmost in confidentiality, discipline and esprit de corps, far different than the school setting involved in *Pickering.* Although cases dealing with the constitutional rights of military personnel are not *controlling* in this instance, many of the same considerations relevant in a military context are equally important to government law enforcement agencies, whether they be the FBI, Secret Service, U.S. Marshal, local police forces, sheriffs, etc.—discipline, supervi-

sion, confidentiality, efficiency and esprit de corps if they are to continue to protect not only the general public but themselves as well.

Government law enforcement agencies, whether they be the FBI, Secret Service, U.S. Marshal, local police forces, sheriffs, etc., are indeed very similar to the military in terms of the need for direction, supervision, discipline, confidentiality, efficiency and esprit de corps. Thus, courts should defer, whenever possible consistent with the Constitution, to the superior expertise of law enforcement professionals in dealing with their respective personnel. As the Supreme Court stated in an analogous context, prison administration, courts "should not 'second-guess the expert administrators on matters on which they are better informed' .... Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline ...." *Bell v. Wolfish*, 441 U.S. 520, 544, 547, 99 S.Ct. 1861, 1876, 1878, 60 L.Ed.2d 447 (1979). Likewise, questions regarding the orderly and efficient operation of a police force are analogous to those concerning administration of health care facilities, in that both situations involve administrative determinations which are best left to the superior expertise of trained professionals. The Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) stated:

> "In determining what is 'reasonable' ... we emphasize that courts must show deference to the judgment exercised by a trained professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. *Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.*" (emphasis added).

The Supreme Court's recent statement regarding the employment requirements of a prosecuting attorney's office is equally significant in the context of law enforcement agencies: "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick v. Myers*, —— U.S. ——, ——, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983).

II.

The plurality opinion puts undue emphasis on the district court's brief statement that the FBI is a "para-military organization wherein security of information, discipline and teamwork are of primary importance." This brief reference to the paramilitary nature of the FBI should not be construed as a finding by the district court that cases pertaining to the constitutional rights of members of the military are controlling in this fact situation. Rather, the district court's statement, when viewed in its proper context, is merely a recognition of the considerations discussed above. Thus, I have concurred in the result reached by the court, but have written separately to emphasize the unique and compelling requirements of law enforcement agencies. I believe the personnel decisions of the FBI and of all law enforcement agencies must be afforded broad deference if these agencies are to be able to perform their proper roles. More is at stake when dealing with the personnel decisions of a law enforcement agency than with those of any other governmental agency. The safety of not only the law enforcement personnel themselves but also the general public, depend on the ability of the administrators of these agencies to maintain proper discipline, confidentiality, supervision and esprit de corps.

Before CUMMINGS, Chief Judge, and PELL, BAUER, WOOD, CUDAHY,* ESCHBACH, POSNER, COFFEY and FLAUM, Circuit Judges.

ORDER

This cause is now before the court on appellant's "Motion to Reconsider, for Stay, and for Remand to the District Court for

---

* Judge Cudahy would deny the motion without prejudice to its being brought in the district court.

Purposes of Supplementing the Record and for Further Consideration" filed June 9, 1983.

■■■ Appellant seeks reconsideration of this case based on newly discovered evidence. His request is the equivalent of a motion under Fed.R.Civ.P. 60(b)(2) requesting relief from judgment because of newly discovered evidence which could not have been discovered by due diligence prior to the district court's judgment. The motion is not properly before this court. "When an appeal from judgment is pending a motion under Rule 60(b) for relief from the judgment because of newly discovered evidence should be filed in the district court and that court should proceed to hear the motion. If the district court indicates that it will allow the motion the court of appeals should then be requested to remand the cause." *Binks Manufacturing Co. v. Ransburg Electro-Coating Corp.,* 281 F.2d 252, 260 (7th Cir. 1960), *cert. dismissed,* 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); *Accord, Washington v. Board of Education,* 498 F.2d 11, 16 (7th Cir.1974) (citing 11 Wright & Miller, Federal Practice and Procedure: Civil § 2873, at 263–65 (1973), commending this practice); *First National Bank of Salem, Ohio v. Hirsch,* 535 F.2d 343, 345–46 (6th Cir.1976) (per curiam); *see generally, Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 280 & n. 22 (D.C.Cir.1971), *cert. denied sub nom., WHDH, Inc. v. FCC,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); J. Moore, Moore's Federal Practice, ¶ 60.30[2] (1982). Appellant failed to comply with this procedure, and hence ordinarily we would deny such a motion without prejudice and permit appellant to follow the established procedure. However, in this case, it appears clear that the district court would be required to deny a Rule 60(b)(2) motion in this case on the ground that it is untimely. Such motions must be filed, under the express terms of the Rule, within one year of entry of judgment, and this time limit is not extended by the maintenance of an appeal, *e.g. Greater Boston Television Corp. v. FCC, supra,* 463 F.2d at 280; J. Moore, Moore's Federal Practice, ¶ 60.28[2] at 399–400 & n. 37, ¶ 60.30[2] at 424 (1982). The motion in this case comes years after the judgment was entered, and comes far too late. Lastly, the motion and accompanying affidavit do not contain facts which support the conclusion that the newly discovered evidence could not have been obtained earlier through due diligence. Typical of this failure is ¶ 3 of appellant's affidavit, in which appellant points to information obtained by a reporter in an interview with appellee. Through the exercise of due diligence, appellant could have deposed appellee, and his contention that he could not have earlier secured the results of a particular reporter's interview with appellee, even if true, in no way establishes that he could not have obtained the information which constitutes the purported newly discovered evidence.

While the thrust of appellant's motion is that reconsideration of this cause is required on the basis of newly discovered evidence, to the extent it can be interpreted as a petition for rehearing of the court's en banc decision on the same record we previously considered, the petition for rehearing is denied.

Accordingly, appellant's June 9, 1983 motion is hereby denied.